No. 57,650

Jaymie L. Hagedorn, by her father and next friend, James R. Hagedorn, *Appellant*, v. Stormont-Vail Regional Medical Center, a/k/a Jane C. Stormont Hospital and Training School for Nurses; Joseph B. Carter, M.D.; Jimmie A. Gleason, M.D.; and Drs. Tappen, Gleason, Ransdell, VandeGarde & Robinson, P.A., a professional corporation, *Appellees*.

(715 P.2d 2)

Opinion filed February 21, 1986.

*Michael E. Callen*, of Callen, Sexton & Shelor, of Kansas City, argued the cause, and *Michael L. Sexton*, of the same firm, was with him on the briefs for appellant.

*Wayne T. Stratton*, of Goodell, Stratton, Edmonds and Palmer, of Topeka,

argued the cause, and *Marla J. Luckert*, of the same firm, was with him on the brief for appellee Stormont-Vail Regional Medical Center.

*Ronald D. Heck*, of Fisher, Heck and Wright, P.A., of Topeka, argued the cause and was on the brief for appellees Jimmie A. Gleason, M.D., and Drs. Tappen, Gleason, Ransdell, VandeGarde & Robinson, P.A.

*James M. Warden*, of Blackwell, Sanders, Matheny, Weary & Lombardi, of Overland Park, argued the cause, and *Carol R. Gilham*, of the same firm, was on the brief for appellee Joseph B. Carter, M.D.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the plaintiff, Jaymie Lyn Hagedorn, from a jury verdict for the defendants in a medical malpractice action. The parties to this appeal, besides the plaintiff, are Stormont-Vail Regional Medical Center; Dr. Joseph B. Carter, M.D., and Dr. Jimmie A. Gleason, M.D., the attending physicians, and the professional association of which Dr. Gleason is a member, Drs. Tappen, Gleason, Ransdell, VandeGarde, and Robinson, P.A.

Vicky Hagedorn, the mother of Jaymie Lyn Hagedorn, was admitted to Stormont-Vail shortly after noon on December 24, 1980, for the delivery of her baby. She had previously been under the care of a physician who is not a party to this action. Dr. Jimmie A. Gleason, an obstetrician and gynecologist, was on call at the hospital and he became Mrs. Hagedorn's attending physician. He first met her about 1:00 o'clock that afternoon. Dr. Gleason was assisted by Joseph B. Carter, M.D., a second-year resident who was assigned to him. Both physicians monitored Mrs. Hagedorn's progress throughout the afternoon, and both were in attendance when Dr. Gleason artificially ruptured her membranes at 6:10 o'clock that evening. An external heart monitor was applied. Dr. Gleason was called to St. Francis Hospital to deliver another patient, and at approximately 8:30 p.m. he called the nurses at Stormont-Vail and was advised that Mrs. Hagedorn was progressing normally. He sent Dr. Carter to Stormont-Vail to be in attendance on Mrs. Hagedorn, and went home, about a ten-minute drive from the hospital. Both Dr. Carter and the nurses were advised to call Dr. Gleason if any problems arose. Dr. Gleason phoned the hospital at 9:30 p.m. and was advised that everything was in order. At 10:05 p.m., one of the nurses in attendance learned from the audible read-outs of the heart monitor that the fetus's heart rate had dropped. She immediately took corrective action and summoned another nurse

for assistance. They administered oxygen, repositioned the patient, applied an internal electrode for fetal heart monitoring, and notified Dr. Carter, who was on the floor. Dr. Carter examined the patient and immediately notified Dr. Gleason, who directed him to prepare the patient for delivery. During the telephone conversation, the decision was made to do a vaginal delivery rather than a Cesarean section. By 10:30 o'clock p.m., the patient was taken to the delivery room. Dr. Gleason arrived at the hospital shortly thereafter, and by 11:00 o'clock p.m., the delivery of Jaymie Lyn Hagedorn was accomplished.

At the time of birth, Jaymie Lyn was very depressed and sluggish. A pediatrician was called and arrived within four minutes after birth. An anesthesiologist was later in attendance. Eventually, the child was taken to the University of Kansas Medical Center for further treatment.

Plaintiff has several serious abnormalities which occurred prior to birth. Her ears are malrotated, she has very widely spaced nipples, and she has a serious heart condition—a constriction of the aorta—which is referred to as coarctation. Additionally, she has upturned earlobes; bent, overlapping toes; and underdeveloped genitals. These abnormalities do not form the basis for plaintiff's claim of damages. Surgery was performed at the Kansas University Medical Center to correct the coarctation.

Plaintiff also suffered brain damage. Concisely stated, it is her claim that the brain damage occurred immediately prior to birth and that it could have and should have been avoided; and that various acts of negligence of the defendants were the direct causes of the brain damage. There is no claim of direct injury by the use of forceps.

The first issue is whether the trial court erred in limiting the plaintiff to the deposition testimony of one of her experts, Dr. Bernard Nathanson. Dr. Nathanson had been retained early on by the appellant to testify as an expert. His deposition, covering some 179 pages, was taken prior to trial. On Sunday evening, after the first full week of the trial, Dr. Nathanson arrived in Topeka. He was picked up at the airport by an associate from plaintiff's law firm. Dr. Nathanson and the attorney went to Stormont-Vail where Dr. Nathanson introduced himself as an ·obstetrician from New York, saying that he just wanted to look around. He did not identify himself to the hospital staff as an

expert witness for the plaintiff in the pending case against the hospital. Similarly, the attorney was not identified. Dr. Nathanson inspected the labor and delivery areas of the hospital and interrogated nurses about practices and procedures. When trial resumed on the following morning, counsel for the hospital asked the court not to permit Dr. Nathanson to testify in this case. Counsel argued that there is a statutory proceeding for inspection, which could have been followed but was not. He argued further that the doctor's deposition had been taken but now he had a different basis for his opinion. He had not supplemented the answers in his deposition. Counsel argued that the visit was a glaring impropriety in violation of the code of civil procedure and in violation of the canons of professional ethics, particularly DR 7-104, 235 Kan. cxlviii, which prohibits a lawyer from communicating with a party whom he knows to be represented by a lawyer, without the prior consent of the opposing lawyer. Counsel for the plaintiff indicated that trial counsel did not know of the visit until after it occurred, and counsel offered to instruct the witness not to go into anything that he may have learned during his visit to the hospital.

The trial judge expressed concern for the rights of all of the parties. Dr. Nathanson's deposition discloses that he testifies regularly as an expert, both in person and by deposition. The judge commented that:

"I've had these professional experts before, and I don't know that I can enter a Motion In Limine that will hold him."

The judge wanted to avoid a mistrial, since the parties had already spent over a week in court time. At the conclusion of the argument of counsel, and after a short recess, the court ruled as follows:

"THE COURT: . . . All right. Here's my view. I think that what has been done is improper, highly improper, whether it's counsels' fault or even more specifically, Mr. and Mrs. Hagedorn's fault, who are the real parties in interest here. The fact is, there has to be some parameters under which discovery is to be conducted. And my feeling is that for an expert witness to go on the defendant's premises, interview employees and so forth prior to testifying without then allowing counsel to have the opportunity to make an inquiry, is improper. And the Court has got to be extremely cautious. What I'm willing to do is take that two or three hours, or whatever it takes, and we'll go over Doctor Nathanson's deposition, and I'm willing to let him testify by deposition. My concern is that if he—I looked briefly at his deposition. If we were to let him be used as a live witness, I'm afraid that we couldn't contain what could happen.

"The only thing to do is go to the testimony he's given before this action that presumably he instigated and I feel that to allow him to testify based upon anything that has not been supplemented by discovery or counsel having reasonable opportunity to inquire could be injecting error in this case, and having already spent six days in trial, I'm not willing to take a risk. If we were at the first day, I would probably bring him in here and tell him what I thought about it, tell him what I'd do to him if he got beyond my boundaries, and take the chance, but I don't want to have to start this case over. And I'm not sure I can hold him.

"So, as far as I'm concerned, Doctor Nathanson will not be permitted to testify in the trial and I'm ready to roll up my sleeves and go to work on the deposition and I'll let the plaintiffs put in his testimony by way of deposition.

. . . .

". . . I understand it's going to take some time, but it's a lot less time than starting over and I don't relish the fact of going through it either. I think that's the fairest way. It allows the plaintiffs to get their testimony in, it protects the defendants from anything that may have resulted due to this extracurricular inspection, or whatever you want to call it. So that's what I'm going to do."

Thereafter, the attorneys and the court worked with the deposition and it was read into evidence. Plaintiff argues on appeal that it was error for the court to prohibit Dr. Nathanson from testifying live.

The situation arose during the course of the trial, and required the trial court's immediate decision. That decision dealt with the manner of the presentation or the exclusion of the expert testimony. The issue for our determination is whether or not the trial court abused its discretion when it refused to permit the witness to testify live, but permitted only his deposition testimony to be presented. The standard of review, where abuse of discretion is claimed, was recently discussed in *Lone Star Industries, Inc. v. Secretary, Kansas Dept. of Transp.*, 234 Kan. 121, 131, 671 P.2d 511 (1983), where we said:

"One who asserts the court has abused its discretion bears the burden of showing such abuse of discretion. *Hoover Equipment Co. v. Smith*, 198 Kan. 127, 134, 422 P.2d 914 (1967); *Skahan v. Powell*, 8 Kan. App. 2d 204, 208, 653 P.2d 1192 (1982); *Lemons v. St. John's Hospital of Salina*, 5 Kan. App. 2d 161, 613 P.2d 957, *rev. denied* 228 Kan. 807 (1980); *State v. Wright*, 4 Kan. App. 2d 196, Syl. ¶ 5, 603 P.2d 1034 (1979), *rev. denied* 227 Kan. 928 (1980). Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion. *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 (1973); *Cook v. Cook*, 231 Kan. 391, 394, 646 P.2d 464 (1982)."

Plaintiff presents several arguments as to why the trial court's

decision was error. She first contends that the court's decision amounted to a sanction under K.S.A. 60-237, and she argues that that statute has no application where the discovery was done wholly outside of the discovery rules. She contends that since there was no court order specifically prohibiting Dr. Nathanson from visiting the hospital, K.S.A. 60-237 sanctions are not applicable. The trial court, however, did not base its decision on K.S.A. 60-237. That statute provides sanctions for failure to make discovery or for failure to comply with a discovery order of the trial court. The statute does not cover the situation which arose in this proceeding. Inspection of the hospital premises could have been requested under K.S.A. 60-234, with notice to the opposing party. That statute was not followed. The trial court's action, although not authorized by 60-237, was not a violation of that section. We do not view the trial court's action as a sanction pursuant to that section, but as a thoughtful compromise between the two competing interests. Plaintiff wished to present the testimony of Dr. Nathanson; defendants had taken Dr. Nathanson's deposition and were prepared to cross-examine him but they were not prepared to examine him after his "extracurricular" visit to the hospital and his interview with the nurses, events about which the defendants had no notice.

Plaintiff points out that one of defendants' grounds for their objection was the failure to comply with K.S.A. 60-226, which provides for the supplementation of responses to discovery. Plaintiff argued at trial and argues here that the doctor's opinions did not change after his visit to the hospital and thus there was no evidence that any of the responses given by him in the prior deposition are incorrect or no longer true. The difficulty with this is that his opinions as expressed in the deposition were based on medical records and depositions; after his visit to the hospital, this was no longer true. His observations at the hospital either fortified his previous opinions or caused them to change. As we observed in *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, Syl.¶ 7, 507 P.2d 288 (1973):

"The taking of pretrial depositions is part of the discovery process authorized by K.S.A. 1972 Supp. 60-226, and among the purposes to be served thereby is ascertaining what an adversary witness may know about matters in litigation and what his probable testimony will be, to the end that the element of surprise will be eliminated so far as possible."

The surprise visit by Dr. Nathanson to the hospital injected

new material as the basis for his opinions. Defendants had no knowledge as to what this information might be. The element of surprise was thus injected back into the lawsuit. There was no suggestion made at trial that the responses could have been supplemented or that the trial could have been recessed to allow defendants to take further depositions of the witness. How much delay this would have occasioned during the trial, and whether it would have rectified the situation, we cannot say. The fact remains that the basis for the doctor's opinions had changed, and there was no supplementation of his deposition.

Plaintiff next argues that the trial court based its ruling in part on K.S.A. 60-445, which authorizes the judge in his or her discretion to exclude admissible evidence if the judge finds that the probative value of the evidence is substantially outweighed by the risk that its admission would unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered. Plaintiff argues there was no surprise because the doctor's opinions did not change. However, even if his opinions had not changed, the basis for the opinions had changed, and this would certainly affect the defendant's cross-examination. All counsel and the trial court were unaware of what might develop during the doctor's testimony, following his unannounced visit to the hospital. The plaintiff further argues that the surprise factor did not outweigh the prejudice to the defendant. However, the trial court did not exclude the testimony but permitted the plaintiff to offer fully the deposition testimony of the expert, taken prior to his visit to the hospital.

Plaintiff makes several other arguments in this regard, but those arguments were not made to the trial court and we find them unpersuasive. We have considered fully the arguments made and the record before the trial court, and we conclude that the trial judge thoughtfully resolved the problem which arose. Plaintiff was permitted to offer the testimony, and defendants were protected from surprise which arose upon the witness's unexpected visit to the hospital and his interrogation of the nurses then on duty. Not only was the discovery unauthorized, but the communication between the attorney and the adverse party was in direct violation of the canons of professional ethics, previously cited. We hold that there was no abuse of discretion

by the trial court. We should point out that the plaintiff also had another expert witness, Dr. James E. Nickel, an obstetrician and gynecologist from Helena, Montana, whose expert testimony parallels that of Dr. Nathanson and was presented live during the trial.

Plaintiff next contends that the trial court erred in admitting the testimony of defendant's expert, Dr. Robert Buehler. Dr. Buehler examined the plaintiff on September 14, 1984, but after some preliminary studies discovered that he needed blood samples from the parents. These were secured and Buehler was then able to complete his analysis. Pretrial conference in this case was held on October 10, 1984, and at that time the trial court entered the following order:

"Concerning defendants' expert, Dr. Robert Buehler in Omaha, Nebraska, the Court ordered defendants to produce a preliminary or interim report of Dr. Buehler before his deposition and to produce Dr. Buehler for his deposition on October 26, 1984, based upon the assumption that the parties are able to obtain blood samples from the plaintiffs and Dr. Buehler is able to complete his analysis of those blood samples in time for the deposition."

In accordance with that order, blood samples were taken, Buehler completed his analysis, his report was received by defendants' counsel on October 24, copy was delivered to plaintiff's counsel, and Dr. Buehler's deposition was taken on October 26, 1984. Plaintiff's counsel were provided with a copy of Dr. Buehler's report prior to the time his deposition was taken, all in accordance with the court's order.

Plaintiff argues that testimony should have been excluded under K.S.A. 60-235(d), which authorizes the court to exclude a physician's testimony if he fails to deliver a report upon request. Plaintiff in this case sought a report from Dr. Buehler, prior to the pretrial conference, but his analysis was not then complete. It was completed upon receipt of the blood samples, and the report was provided prior to the taking of his deposition as required by the trial court's order. The plaintiff also argues that she was surprised by the testimony and did not have time to get another geneticist. Plaintiff had consulted a geneticist prior to the taking of the Buehler deposition; counsel had a copy of the Buehler report and presumably had a transcript of his deposition; and there elapsed eleven days between the taking of the Buehler deposition and the presentation of his testimony. Plaintiff could have secured and presented testimony of its own experts there-

after if plaintiff had wished to do so. Under the circumstances, the trial court did not abuse its discretion in admitting the testimony of the witness.

The third issue plaintiff raises is whether the trial court erred by granting the defendants a directed verdict on the issue of "traumatic mid-forceps delivery." Plaintiff argues that under the evidence a mid-forceps delivery was more traumatic to a depressed child than delivery by Cesarean section would have been, and that this was a deviation from the standard of care. The trouble is that this was not an issue on which the case was being tried. The many claims of negligence were set out in detail during the pretrial conference, and deviation from the standard of care by mid-forceps or vaginal delivery rather than by Cesarean section was not one of the claims of negligence. The trial court refused to instruct on this non-issue and granted a directed verdict thereon. However, the trial court submitted to the jury plaintiff's claim that the physicians were negligent in failing to perform a timely delivery of the child and in failing to order preparation for and perform a Cesarean section, and that Dr. Gleason was negligent in allowing Dr. Carter to perform the delivery. There was never any claim that any physical injury was caused to the child by use of the forceps. The refusal of the trial court to inject a new issue into the lawsuit during trial was not error.

For her next issue, plaintiff claims that the trial court erred in admitting into evidence instances of specific conduct for the purpose of impeaching plaintiff's expert witness. During the taking of the Nathanson deposition, the following exchange took place:

"Q. [by Harold S. Youngentob, attorney for Stormont-Vail] Haven't you admitted in the past that based upon need, you would provide false information?

"MR. SEXTON: [attorney for plaintiff] Same objection as before. [We find no prior objection.] That is out of context.

"A. Counselor, I was involved in a political revolution in the late 60's and during those times it was necessary in effecting this revolution to persuade the populace of the rightness of this political cause, and some questionable means were used. I have never fabricated, however, in any way, shape or form under oath the statements you are about to read from that book of mine, which were not made under oath at any time. They were not testimony. They were merely political instruments.

"Q. From that book I was about to read, you were advocating a position and in order to advocate that position you were willing to provide false information; is that correct?

"MR. SEXTON: I object. The testimony that you are trying to elicit is totally irrelevant to the facts that we have before us here and I don't think it is a proper question to put before the doctor.

"A. You are getting into the area of the politics of abortion, which I am sure you know is an inflammatory, very difficult and thorny area, and you are also undoubtedly aware that I have changed my mind regarding the subject of abortion and have published two books on the subject. You are also undoubtedly aware I have testified in the United States Senate on two occasions on this issue. I have testified in federal district courts on this issue in Missouri, and I have been consultant to the Portuguese government recently on this issue, so the issue is political. It has not the slightest bit of relevance to this particular case.

"Your question is disingenuous and I see no compulsion on my part to answer it."

When counsel and the court reviewed the deposition prior to its being read to the jury, plaintiff's counsel objected to the reading of this portion into evidence for the reason that the book was not sworn testimony and the response gets into the question of abortion, a prejudicial subject. Further, toward the conclusion of the argument before the court on the admissibility of this passage, the following exchange took place:

"MR. STRATTON: What he says in 1978 is that in 1973 he sold a bill of goods to people, and he knowingly lied to people, and he can explain it as saying it was in the political context and it wasn't under oath. I think if a man is a liar, he's a liar, whether he's under oath or not, myself.

"MR. SEXTON: And obviously, Judge, our position is that under the Statutes, that's not a proper method of impeachment.

"THE COURT: It goes to credibility. I will allow it in."

Plaintiff argues that the testimony should not have been allowed because the defendants were introducing evidence of specific instances of conduct for the purpose of impeaching the doctor's testimony. K.S.A. 60-420 and K.S.A. 60-422(d) are in point. These read as follows:

"**60-420. Evidence generally affecting credibility.** Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

"**60-422. Further limitations on admissibility of evidence affecting credibility.** As affecting the credibility of a witness . . . (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

In *State v. Aldrich*, 232 Kan. 783, 658 P.2d 1027, *cert. denied* 462 U.S. 1136 (1983), defense counsel proposed to impeach a

witness by inquiring whether she had once sworn to a false affidavit in order to receive welfare benefits. The trial court refused to allow such evidence, and we affirmed, holding that a witness's character traits for honesty and veracity could only be shown by opinion testimony or evidence of reputation, and not by specific instances of the witness's conduct.

Assuming that the two questions and the responses were improper, we turn to the ultimate question—whether the admission of that evidence constitutes reversible error. Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded. See *City of Ottawa v. Heathman*, 236 Kan. 417, 426, 690 P.2d 1375 (1984), and cases cited therein. Considering the wealth of evidence that was presented in this case, we hold that this testimony was relatively insignificant and did not substantially prejudice the plaintiff. Under the circumstances we hold that it was harmless error.

Next, plaintiff complains that the trial court improperly admitted expert testimony without proper foundation. The first occurred during the cross-examination of Dr. Theodore E. Young, a pediatrician called as an expert witness on behalf of the plaintiff. Dr. Young had previously stated that he could not predict how long the plaintiff would live, based upon a reasonable degree of medical certainty. He was asked this question and responded as follows:

"Q. . . . Based on the facts you know about Jaymie's condition and based upon your experience as a pediatrician and your experience in caring for Jaymie, do you have a best estimate opinion as to the number of years Jaymie might be expected to live?

"A. Phrased in that way, not saying reasonable degree of medical certainty, I would estimate it would be unlikely that she would live past 20 to 30 years and she might live a much shorter period than that."

Dr. Young, a pediatrician of some thirty-eight years' experience, had been plaintiff's pediatrician for about four years. He was aware of her extensive problems. Prior to the exchange targeted above he testified, without objection, that he did not think that she would live a normal life span. The evidence, of course, went only to the issue of damages and not to liability. Since the jury determined that there was no liability, there was no need to address the issue of damages. Under the circumstances—considering the witness's experience, his close contact

with plaintiff over a four-year period, and his candid response that he could not give a view based upon a reasonable medical certainty but could only express his professional opinion—we conclude that the trial court did not err in permitting this cross-examination.

The final specification of error in the admission of medical testimony arose during the cross-examination of Dr. Kenneth K. Goertz, a pediatric cardiologist called as an expert witness on behalf of the plaintiff. During his cross-examination, a question was asked and an objection was interposed that the question was not in proper form and was argumentative. Counsel rephrased the question and it was then answered without objection. On appeal, plaintiff's counsel argues that the question was objectionable because it asked the witness to assume facts not in evidence, and it did not require the witness to base his answer on a reasonable degree of medical certainty. Neither of these objections were made at trial. Further, since there was no objection to the rephrased question, appellate consideration of this claim of error is precluded. K.S.A. 60-404; and see *Douglas v. Lombardino*, 236 Kan. 471, 482, 693 P.2d 1138 (1985). We conclude that there was no error in the cross-examination of these medical experts.

Finally, plaintiff argues that the trial court erred in denying her motion in limine concerning evidence of marijuana usage by her mother. During proceedings prior to trial plaintiff, by a motion in limine, sought to prohibit the defendants from introducing evidence that her mother, Vicky Hagedorn, had smoked marijuana on several occasions during the latter part of her pregnancy. Dr. Buehler, one of defendant's experts, had testified during the taking of his deposition that marijuana can affect fetal weight and fetal size; that fetal size includes head circumference, and therefore brain involvement. He considered this not to be the most likely cause of her brain damage but possibly a contributing factor. After hearing arguments from all counsel, the trial court denied the motion in limine and stated that marijuana usage might be relevant depending on the foundation laid for it during the presentation of expert testimony. At trial, the only mention that was made of Vicky Hagedorn's use of marijuana was made by plaintiff's counsel in the opening statement. Defendants made no reference to it.

The standard to be applied in reviewing the trial court's ruling on a motion in limine is whether the trial court abused its discretion. *U.S.D. No. 464 v. Porter*, 234 Kan. 690, 694, 676 P.2d 84 (1984).

Here, there was some evidence in the deposition of Dr. Buehler indicating that the evidence could be material. At the time the ruling was made, the trial judge was careful to state that while he was overruling the motion in limine at that stage of the proceedings, the evidence would only be allowed in if proper foundation was laid at trial or if appellant brought it out first. Under the circumstances, the trial court did not abuse its discretion in ruling on the motion in limine, and we find no error.

The judgment is affirmed.