(31 P.3d 307)
No. 85,810

CLYDE RODREICK, *Appellee*, v. THE ESTATE OF EVERETT H.
WIKOFF, *Appellant*, and THOMAS RODREICK, *Appellee*, v. THE
ESTATE OF EVERETT H. WIKOFF, *Appellant*.

—

Opinion filed
September 7, 2001.

*Brian C. Wright* and *Stephen L. Brave*, of Turner & Boisseau, of Great Bend, for appellant.

*Richard A. Boeckman*, of Keenan & Boeckman, of Great Bend, for appellees.

Before RULON, C.J., LEWIS, J., and STEPHEN D. HILL, District Judge, assigned.

HILL, J.: In this appeal, the Estate of Everett H. Wikoff (Estate) appeals the jury's award to Clyde and Thomas Rodreick of future medical expenses. The Estate also argues that the court improperly admitted a deposition into evidence in lieu of testimony and should have imposed a sanction for not complying with a reasonable discovery request. We affirm.

Clyde Rodreick, 73, is the father of Thomas Rodreick. On October 19, 1996, Wikoff drove his vehicle into the rear of the Rodreick vehicle while their vehicle was stopped at a stoplight. Both Clyde and Thomas suffered whiplash and resulting neck pain and stiffness.

At the conclusion of the trial, the jury found Wikoff 100% at fault. The jury awarded $21,000 for future medical expenses to Clyde out of a total award of $43,473.64. The jury also awarded Thomas $10,000 in future medical expenses for a total of $34,203.16. The trial court denied Wikoff's motion for judgment notwithstanding the verdict and his motion for sanctions.

Wikoff is now deceased. His estate brings forward three issues in this appeal:

(1) Did the court properly admit the deposition of Rodreick's expert witness instead of live testimony, when the witness' office was less than 100 straight-lines miles from the site of the trial?

(2) Does the record contain sufficient evidence to support the amount of future medical expenses awarded by the jury to each plaintiff?

(3) Did the court err in refusing to impose sanctions against the defendant for a claimed failure to produce discoverable material?

During the trial, the Rodreicks presented the deposition of C. Reiff Brown, M.D. Dr. Brown is an expert retained by both Rodreicks to evaluate the extent of their injuries. The trial of this case was conducted in Great Bend. Dr. Brown lives in Wichita.

Suspecting that the Rodreicks intended to submit Dr. Brown's deposition to the jury rather than produce him at trial, Wikoff filed a motion in limine seeking to exclude Dr. Brown's deposition. Along with the motion in limine, Wikoff submitted an affidavit by his own expert which maintained that the straight-line distance between Dr. Brown's location in Wichita and the courthouse in Great Bend was just over 95 miles. Wikoff argued that since Brown lived less than 100 miles from the site of the trial, he should be compelled to testify in person.

The Rodreicks responded to the motion, arguing that Dr. Brown would be forced to travel 114 miles by road to reach the place of trial and, therefore, should be considered unavailable, and urged the trial court to deny the motion.

This matter was brought before the trial court over the weekend just before the trial. The trial judge conducted a hearing from her home over the telephone. That hearing is not transcribed, but the parties and the trial court orally recounted the proceeding for the record on the first day of the trial. The trial judge stated:

"Well, as Mr. Wright has pointed out that I have overruled the motion in limine and determined, according to a reasonable interpretation and relying on the official mile map that the Court uses, it's 114 miles to Wichita from Great Bend, and reasonable interpretation seems to me that it would be the distance that one has to travel from here to there, and that we can rely on the official map that is published by the State of Kansas in determining the mileage in this case; otherwise, you probably just simply get to take the interpretation and raise a lot of issues and questions about from like what to what point to determine the mileage. In any event, we're going to allow—I'm going to allow using the videotaped deposition of Doctor Brown."

Wikoff renewed his objection to the use of the deposition just before it was admitted at trial.

Wikoff argues that the trial court's recitation does not sufficiently show the method by which the court determined the distance. Wikoff suggests that the court may have determined that the straight-line distance was 114 miles and rejected the affidavit filed by the Rodreicks. We find no deficiency in the record, for it is apparent the trial court used the official state map to compute travel distances and not straight-line distances.

The 2000 Official State Transportation Map, published by the Department of Transportation, denotes a 114-mile distance on its distance table between Great Bend and Wichita. The table provides that "[a]ll distances were calculated using the shortest State, U.S., Interstate and Kansas turnpike route combinations." This corresponds to the findings of the trial court on this issue.

This question boils down to whether K.S.A. 2000 Supp. 60-232(a)(3)(b) contemplates an outer range of 100 straight-line miles or whether the statute allows a party to substitute deposition testimony for a witness who would be forced to *travel* more than 100 miles by road to the site of the trial.

K.S.A. 2000 Supp. 60-232 provides:

"(a) *Use of deposition.* At the trial . . . any part or all of a deposition . . . may be used against any party who was present or represented at the taking of the deposition . . . .

. . . .

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds that:

. . . .

(B) the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the state of Kansas, unless it appears that the absence of the witness was procured by the party offering the deposition."

This is an issue of first impression.

We interpret this statute de novo. Our goal is to implement the intent of the legislature according to the plain language of the provision in question. See *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956(1993).

In making this interpretation, we are not limited to the language used in the statute but can look at the background and circumstances surrounding the passage of the statute. " 'In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested.' " 253 Kan. at 436.

The Estate argues that the straight-line measurement is the accepted federal method of determining distance. The appellant sug-

gests that the interpretations of similar rules by our federal courts offer guidance. F. R. Civ. Proc. 32(a)(3)(B) is virtually identical to the Kansas rule. In *SCM Corp. v. Xerox Corp.*, 76 F.R.D. 214, 215-16 (D. Conn. 1977), the court determined Federal Rule 32 contemplated a straight-line measurement. The Estate urges us to proceed in lockstep with the federal courts and adopt the view presented in *SCM*.

*SCM* attempted to unify interpretations of rules about attendance of witnesses, F. R. Civ. Proc. 32(a)(3)(B), with rules regarding subpoenas and summonses, F. R. Civ. Proc. 45(c)(3)(A)(ii) and (e)(1) and F. R. Civ. Proc. 4(f) (now F. R. Civ. Proc. 4[k]). Rules 45 and 4 limit the reach of subpoenas or summonses to 100 straight-line miles of the courthouse. The *SCM* court stated:

"Uniform interpretation of the 100-mile provision in all three rules achieves several benefits. It modestly expends the reach of civil trial subpoenas, thus promoting the favored policy of affording the trier an opportunity to hear witnesses in person. [Citation omitted.] It avoids trivial disputes as to which actually are the ordinary, usual, and shortest routes of travel. Finally, it eliminates the anomaly that would otherwise exist of a plaintiff's being able to sue a person within 100 air miles of the courthouse, but not being able to present that defendant's live testimony to the trier when the defendant lives more than 100 travel miles away." *SCM*, 76 F.R.D. at 215-16.

We believe that the legislature intended for depositions to be substituted for witnesses if the witness was beyond the subpoena power of the court. Therefore, we recognize at the outset that any interpretation we make concerning our rule about substituting depositions for live testimony will affect future interpretations of the reach of a court's subpoena power under K.S.A. 2000 Supp. 60-245 (similar to federal rule 45). But, we hasten to point out that in K.S.A. 2000 Supp. 60-245(c)(3)(A)(ii), the statute directs a court to quash or modify a subpoena if it requires a resident of this state, who is not a party, to *travel* more than 100 miles from the place where that person resides or regularly transacts business, absent a showing of substantial need. To us, this language explicitly focuses on the distance traveled, not the geographical distance between the courthouse and the witness' location. We believe that this is a more reasonable interpretation than the view taken by the federal

courts when they ignore similar language in Rule 45. See F. R. Civ. Proc. 45(c)(3)(A)(ii).

We interpret K.S.A. 2000 Supp. 60-232(a)(3)(B) to mean that a deposition may be substituted for testimony if the witness would be forced to *travel* more than 100 miles to the place of trial and not 100 straight-line miles. Human beings travel not as the crow does but by means of transportation. We think that the method employed by the trial court, examining the official travel map published by the Kansas Department of Transportation, is a reasonable and effective way of solving such disputes.

Besides, we do not view the admission of this deposition as a substantial trial error. Rather, we believe if there was an error, it was harmless in this instance. Harmless error is error which does not prejudice the substantial rights of a party. *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986). The parties took Dr. Brown's deposition in this case, and Wikoff had the opportunity to pose questions to the doctor about future medical expenses. The Estate argues that it had no notice that Thomas was claiming future medical expenses until Thomas took the witness stand. Thus, the Estate says it did not cross-examine Dr. Brown regarding Thomas' future medical expenses during his deposition. The Estate concludes by saying that had Dr. Brown been available at trial in person, the Estate would have been able to cross-examine him on the extent of Thomas' future expenses.

We find this argument to be speculative. We see no plausible reason why Wikoff should not have questioned the doctor about such an issue during the course of the deposition. Wikoff seems to assume that the Rodreicks would have called Dr. Brown to the stand after Clyde and Thomas had testified, permitting Wikoff to work from their testimony into his cross-examination of Dr. Brown. Dr. Brown could have been called to testify before the Rodreicks. Finally, when Dr. Brown did not offer any substantial testimony specifically regarding Thomas' future medical expenses at the deposition, it seems to us that Wikoff had the same opportunity he would have had at the trial to explore the omission. We find no significant prejudice. Any error is harmless. As appellant, Wikoff

has the burden to show prejudice. We conclude that the Wikoff Estate has not proven prejudice on this ground.

Turning to the second issue, we examine the sufficiency of the evidence. Insofar as jury awards for future medical expenses, a reviewing court will not reverse or direct a remittitur unless the amount awarded shocks the court's conscience. *See Smith v. Massey-Ferguson, Inc.*, 256 Kan. 90, 115, 883 P.2d 1120 (1994).

We review the evidence concerning Clyde and Thomas separately. With respect to Clyde, Dr. Brown gave the opinion that he would require occasional periods of physical therapy and medication for pain management. Typically, the treatment involved 2-3 sessions per week. The therapy sessions following the accident cost anywhere from $300 to $665. Additionally, Clyde testified that he spent approximately $40-50 in pain medication each month. He testified that he did not keep a record of expenses for his medication. There is no testimony regarding how often he would seek future care or whether a medical or surgical procedure could be necessary in the future. We believe that this evidence is sufficient to warrant submitting the question of future medical expenses to the jury. Dr. Brown testified that Clyde's condition was permanent. With Clyde's testimony that he continues to take pain medication, we believe that this supports the jury's finding that Clyde would face continuing medical treatment.

With respect to the amount of the award, we understand that the trial court told the jury that at age 73, Clyde had a life expectancy of 14 years. Ten additional physical therapy sessions over his lifetime could cost nearly $6,500. At $500-600 per year, Clyde could spend around $7,000 on pain medication. This totals $13,500. Therefore, the jury's award of $21,000 based upon such facts is not outrageous and does not shock the conscience of this court.

On the other hand, Thomas' case for future medical expenses is less strong but still exists. Dr. Brown testified that Thomas' symptoms would continue to bother him indefinitely. Brown gave the opinion that Thomas would continue to have intermittent flare-ups and discomfort. Based upon this testimony, the jury could reasonably conclude that Thomas would need further treatment.

The record reveals that a round of intensive chiropractic treatment until February 1997 was required for Thomas. At that point, the treating chiropractor indicated that Thomas had reached maximum improvement. For this, the chiropractor charged Thomas an average of $30 per visit for 13 visits during 1997. This equaled $390 with additional charges for x-rays and lab work. The chiropractor also gave the opinion that Thomas would need periodic care to maintain his health.

In his own behalf, Thomas submitted receipts for prescription pain and muscle relaxant medications. Some of the prescriptions cost more than $100. There is no evidence Thomas would require consistent medical care, nor was there evidence that Thomas would require regular pain medication after the period of acute care following the accident. The trial court instructed the jury that Thomas's age was 42, and he had a life expectancy of 34 years.

The award of $10,000 for future medical expenses does not shock our consciences. We compare *Smith*, where the jury had awarded $35,000 in future medical expenses, surpassing the Supreme Court's own projection based on its reading of the record of $11,043. *Smith* held such a disparity did not "shock the conscience of the court." 256 Kan. at 118. We are not compelled to reverse.

We turn now to the sanctions issue. At the end of the trial, the Estate moved for sanctions. The Estate made a discovery request to the Rodreicks for any and all documents, correspondence, memoranda, and written materials of any kind in support of the amount of damages for which recovery was sought in this action. It argued to the trial court that it was "blind-sided" because the Rodreicks failed to present any written receipts or other proof to show the value of the medications they continued to take. The Estate now implies that the Rodreicks concealed the true cost of their medication.

The imposition of sanctions is within the sound discretion of the trial court. We review such decisions on a basis of abuse. See *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 852, 860-61, 844 P.2d 768 (1993). The object of a sanction should be to prevent the party against whom sanctions are being imposed

from profiting by its own violation. *Mansfield Painting & Decorating, Inc. v. Budlaw Services, Inc.*, 3 Kan. App. 2d 77, 80, 589 P.2d 643, *rev. denied* 225 Kan. 844 (1979).

A careful reading of the record does not reveal that Clyde or Thomas wilfully concealed or destroyed material that could be considered discoverable. A more reasonable interpretation of the record is that they did not keep the receipts and the documents are, therefore, simply not available for discovery. Clyde relied on his oral testimony alone to support his request for damages. This issue goes to the weight of the evidence, but the record does not establish any pattern of wrongdoing by the Rodreicks.

We find that the trial court's refusal to sanction Clyde or Thomas reasonable and not an abuse of discretion.

Affirmed.