NOT DESIGNATED FOR PUBLICATION

No. 119,930

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NAPOLEON VASQUEZ-MEJIA,
*Appellee*,

v.

WILLIAM GARRISON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ford District Court; E. LEIGH HOOD, judge. Opinion filed May 24, 2019. Affirmed.

*Travis J. Ternes*, of Watkins Calcara, Chtd., of Great Bend, for appellant.

*Stephen M. Gorny* and *Christopher D. Dandurand*, of The Gorny Law Firm, LC, of Kansas City, Missouri, and *Thomas R. Fields*, of Law Office of Thomas R. Fields, PA, of Kansas City, for appellee.

Before HILL, P.J., BRUNS, J., and BURGESS, S.J.

PER CURIAM:  William Garrison rear-ended Napoleon Vasquez-Mejia's vehicle. Vasquez-Mejia developed back pain and sought treatment. This suit followed. A jury awarded Vasquez-Mejia damages including future medical expenses. On appeal, Garrison questions whether the trial court abused its discretion by excluding collateral source evidence to impeach Vasquez-Mejia's testimony that he could not afford treatment and by admitting evidence concerning the cost of future medical expenses over foundation and hearsay objections. Finding that the trial court did not abuse its discretion, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

On March 16, 2015, Garrison rear-ended Vasquez-Mejia's motor vehicle. Garrison admitted the accident was his fault. Vasquez-Mejia felt fine initially. However, later that day Vasquez-Mejia had back, neck, and shoulder pain.

The day after the accident, Vasquez-Mejia saw Dr. Nassif Azzi. Dr. Azzi took x-rays of Vasquez-Mejia's neck, shoulders, and lower back. Dr. Azzi prescribed medication, but Vasquez-Mejia did not fill the prescription. Vasquez-Mejia testified he would have had to pay out of pocket, the medication was expensive, and he could not afford the medication. Vasquez-Mejia did not have health insurance at the time of the accident but he did have $4,500 in personal injury protection (PIP) benefits through his auto insurance carrier.

Vasquez-Mejia next saw Dr. Azzi on May 6, 2015. Dr. Azzi recommended physical therapy. Vasquez-Mejia attended this initial round of physical therapy regularly and he did not miss any visits. But he still had pain and Dr. Azzi referred him to Dr. Alok Shah.

Vasquez-Mejia began seeing Dr. Shah in August 2015. Dr. Shah prescribed pain medication and sent Vasquez-Mejia for another round of physical therapy. Vasquez-Mejia testified he cancelled physical therapy sessions on September 25, 2015, October 1, 2015, and October 5, 2015, because he had to pay out of pocket, he and his wife had a newborn baby, it was difficult to take off from work, and he had to support his family. Dr. Shah ordered an MRI and then two steroid injections in Vasquez-Mejia's back. Vasquez-Mejia cancelled the second injection because he could not afford the cost of the injection. In December 2015, Vasquez-Mejia discussed spinal fusion surgery with Dr. Shah. Vasquez-Mejia testified he could not afford the surgery. Vasquez-Mejia tried, but could not obtain preapproval for the surgery from Garrison's liability insurance carrier.

Before the accident, Vasquez-Mejia and his wife, Olivia Ozuna, ran a taco truck. They sold the taco truck in September or October 2015. Vasquez-Mejia worked some odd jobs. In December 2015, Ozuna began working for National Beef. Vasquez-Mejia was covered on Ozuna's health insurance plan in March or April 2016. In March 2016, Vasquez-Mejia began working for Pride Ag Resources. Vasquez-Mejia quit working for Pride Ag on July 29, 2016. Vasquez-Mejia started working for Stagecoach in November 2016.

Vasquez-Mejia saw Dr. Thomas Nienke on September 16, 2016. Dr. Nienke scheduled a spinal fusion surgery. Vasquez-Mejia decided not to have the surgery at this time because his daughter was going to college soon and he needed to get a job as soon as possible. Vasquez-Mejia cancelled the surgery in October 2016. According to Dr. Nienke's records, Vasquez-Mejia cancelled the surgery because he was the only one in his family employed. However, at that time, Ozuna was working. Vasquez-Mejia was not. Vasquez-Mejia testified he meant that he cancelled the surgery because he did not want to go down to one income. He was about to start working for Stagecoach, and Ozuna worked for National Beef.

*Motions in limine*

Before trial, both sides filed motions in limine. Garrison sought to exclude any testimony that Vasquez-Mejia could not afford treatment. Vasquez-Mejia sought to exclude evidence under the collateral source rule that he had health insurance and PIP coverage. Vasquez-Mejia also argued that Garrison's suggestion that he was not injured would open the door to testimony that Vasquez-Mejia had negotiated with Garrison's liability insurance carrier to attempt to get recommended treatment covered. The trial court ruled that because Garrison intended to suggest Vasquez-Mejia did not obtain certain treatment because he was not injured, Vasquez-Mejia could testify that he did not obtain the treatment because he could not afford it. But the trial court ruled that evidence

3

of insurance was inadmissible. Before cross-examination of Vasquez-Mejia, Garrison asked the trial court, "Yesterday, we heard Mr. Vasquez-Mejia testify that he was unable to afford pain prescription that would have been prescribed March 17, 2015. At that time, he still had PIP coverage. I want to know if I'm allowed to introduce the PIP coverage?" The trial court responded, "No, you're not."

At trial, there were several mentions of Vasquez-Mejia not being able to afford surgery in 2015. Ozuna testified that when Dr. Shah recommended surgery, Vasquez-Mejia said it was "very expensive and that obviously we couldn't pay for it." Vasquez-Mejia testified he could not afford the surgery in December 2015. Vasquez-Mejia testified that he wanted to have the surgery after the trial if it would not affect his income and have his family down to one income. In closing argument, Vasquez-Mejia's counsel stated, "He told you why he didn't have the operation in 2015. Couldn't afford it."

*The verdict*

The jury awarded Vasquez-Mejia the following damages:

- Noneconomic loss to date: $27,500
- Future noneconomic: $0
- Medical expenses to date: $6,000
- Future medical expenses: $85,000
- Economic loss to date: $3,000
- Future economic loss: $6,000
- Total: $127,500.

Garrison filed a motion for a new trial raising the same issues he now raises on appeal. The trial court denied the motion. Garrison timely appealed.

4

ANALYSIS

All relevant evidence is admissible. K.S.A. 60-407(f). K.S.A. 60-401(b) defines relevant evidence as evidence having "any tendency in reason to prove any material fact." *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). This definition encompasses two elements: a materiality element and a probative element. Standards of review for each element vary. Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *In re Acquisition of Property by Eminent Domain*, 299 Kan. 37, 44, 320 P.3d 955 (2014). The appellate standard of review for materiality is de novo. *Page*, 303 Kan. at 550. "'Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion.' [Citation omitted.]" *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). Even if evidence is relevant, a trial court has discretion to exclude it where the court finds its probative value is outweighed by its potential for producing undue prejudice. K.S.A. 60-445. An appellate court reviews any such determination for an abuse of discretion. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013).

A court's consideration of the admissibility of evidence can also require application of statutory rules controlling the admission and exclusion of certain types of evidence. These statutory rules are applied as a matter of law or as an exercise of the trial court's discretion, depending on the applicable rule. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). The standard of appellate review will vary accordingly.

A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 435, 6 P.3d 871 (1999).

The erroneous admission of evidence is subject to review for harmless error under K.S.A. 2018 Supp. 60-261. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013).

5

DID THE TRIAL COURT ABUSE ITS DISCRETION BY EXCLUDING EVIDENCE OF VASQUEZ-MEJIA'S PIP BENEFITS AND HEALTH INSURANCE COVERAGE TO IMPEACH HIS TESTIMONY THAT HE COULD NOT AFFORD TREATMENT?

Kansas courts adhere to the collateral source rule. "It is well settled that the damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance effected by him, and to the procurement of which the wrongdoer did not contribute." *Rexroad v. Kansas Power & Light Co.,* 192 Kan. 343, 354, 388 P.2d 832 (1964).

> "At common law, the collateral source rule prevented the jury from hearing evidence of payments made to an injured person by a source independent of the tortfeasor as a result of the occurrence upon which the personal injury action is based. Under the collateral source rule, benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." *Martinez v. Milburn Enterprises, Inc.*, 290 Kan. 572, Syl. ¶ 1, 233 P.3d 205 (2010).

"The purpose of the rule is to prevent the tortfeasor from escaping full liability for his or her actions by requiring the tortfeasor to compensate the injured party for all of the harm, not just the net loss." *Zak v. Riffel*, 34 Kan. App. 2d 93, Syl. ¶ 8, 115 P.3d 165 (2005). Garrison argues that an exception to the collateral source rule should apply in this case. This court is not willing to recognize this claimed exception to a well-established rule.

*Does the collateral source rule apply to future medical costs?*

An appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district court's decision on admission or exclusion of evidence. *Bowen*, 299 Kan. at 349.

6

Garrison contends that the collateral source rule bars the jury from hearing evidence of payments made to an injured person by a collateral source; but here he only wanted to introduce evidence of PIP benefits and health insurance available to impeach Vasquez-Mejia's testimony that he could not afford surgery.

However, the purpose of the collateral source rule would be thwarted if not applied equally to future medical costs and already paid medical costs. Evidence of an injured party's insurance cannot be used to diminish the damages otherwise recoverable from the tortfeasor. Those damages may include future medical costs.

*Can collateral source evidence be used for impeachment?*

Garrison notes there is no Kansas appellate court decision determining whether placing plaintiff's financial condition "at issue" opens the door to the introduction of collateral source evidence. He cites cases from other jurisdictions and argues that collateral source evidence should be permitted in Kansas for impeachment purposes.

Our Supreme Court acknowledges that a party can "open the door" to otherwise inadmissible evidence. *State v. McClanahan*, 259 Kan. 86, 94, 910 P.2d 193 (1996). This court has specifically stated that "[e]vidence of a collateral source payment may be admissible if it has probative value on an issue not inherently related to the measurement of damages." *Zak*, 34 Kan. App. 2d 93, Syl. ¶ 10.

A number of states permit collateral source evidence for impeachment or other purposes unrelated to the calculation of damages. See, e.g., *Younts v. Baldor Elec. Co. Inc.*, 310 Ark. 86, 89 832 S.W.2d 832 (1992) (when plaintiff testified about his financial condition in a false or misleading manner, he opened the door for admission of collateral source evidence); *James v. Glazer*, 570 A.2d 1150, 1155 (Del. 1990) (possible prejudice from collateral source evidence was outweighed by the desire for effective cross-

7

examination and impeachment); *Ratcliff v. Sprint Missouri, Inc.*, 261 S.W.3d 534, 545-46 (Mo. Ct. App. 2008) (when plaintiff voluntarily injected his financial condition into the lawsuit in connection with a failure to obtain treatment, collateral source evidence was permitted); *Lynn v. Jelinek*, No. A-03-1318, 2005 WL 2007150, at *4 (Neb. Ct. App. 2005) (unpublished opinion) (questions concerning plaintiff's health insurance were permitted to correct the "false impression" left by plaintiff's testimony that he stopped physical therapy to save money); but see *Thornton v. Sanders,* 756 So. 2d 15, 18-19 (Miss. Ct. App. 1999) (refused to recognize an exception to the collateral source rule for impeachment); *Cruz v. Groth*, 2009 S.D.19, ¶ 12, 763 N.W.2d 810, 814 (2009) (court "remain[ed] skeptical" of using collateral source evidence for impeachment even when plaintiff could argue free of contradiction that he could not afford treatment, but court did not rule out such use in another case).

The decision whether a party has sufficiently opened the door to collateral source evidence is in the discretion of the trial court. In all events, the court still must weigh the probative value of the collateral source evidence versus the prejudicial effects. The main concern is whether any exception may swallow the rule.

*Was the trial court's exclusion of health insurance and PIP benefits unreasonable?*

Garrison contends that Vasquez-Mejia testified he was unable to pay for medication when he in fact had PIP coverage available and that he was unable to pay for surgery when he had health insurance available. Garrison argues he should have been permitted to challenge Vasquez-Mejia's testimony that he was unable to pay with evidence of the PIP coverage and health insurance. Garrison admits that Vasquez-Mejia did not have PIP benefits or health insurance available when he saw Dr. Shah in December 2015.

The trial court excluded any mention of insurance, noting that in dealing with automobile and health insurance carriers, Vasquez-Mejia would have to get treatment, submit his claims, and then the insurance carrier may or may not pay. The trial court ruled the testimony concerning Vasquez-Mejia's inability to pay would not open the door to evidence of insurance.

There are two incidents Garrison claims should be subject to an exception: (1) the surgery scheduled for October 2016 with Dr. Nienke, and (2) the medication prescribed on March 17, 2015.

*Dr. Nienke Surgery—October 2016*

Vasquez-Mejia had reasons other than just the cost of surgery for cancelling the surgery with Dr. Nienke in 2016. He testified that after calling and learning the cost and the risks of surgery, he talked it over with his wife. He testified that his daughter was going to college soon and he needed to get a job as soon as possible. If he had the surgery in October, he could not start his job at Stagecoach in November. Vasquez-Mejia testified he and his wife did not want to go down to one income. Ozuna confirmed that they had discussed the surgery. They were concerned because they have four children and the recovery period was three to six months; Vasquez-Mejia would have to be off work for that time.

While Vasquez-Mejia's testimony related to his financial condition, it centered on his ability to support his family (including one child going to college) while recovering from surgery and not working. It related to his need for future economic loss damages to compensate for his lost income so he could have the surgery. Vasquez-Mejia did not testify in a false or misleading manner on this point. The probative value of the evidence of health insurance was limited, and its prejudicial value great. The trial court's exclusion of this evidence was not unreasonable.

9

*Prescription—March 2015*

Dr. Azzi prescribed medication the day after the accident, but Vasquez-Mejia did not fill the prescription. Vasquez-Mejia testified he would have had to pay out of pocket, the medication was expensive, and he could not afford the medication. Vasquez-Mejia did not have health insurance at the time of the accident, but he did have $4,500 in personal injury protection through his auto insurance carrier.

Vasquez-Mejia argues that he had received no PIP payments at the time the prescription was entered. He did receive PIP benefits until six weeks after the collision. He argues that it was Garrison's attacks on Vasquez-Mejia's credibility and the severity of his injury that permitted him to explain that he could not afford treatment.

The existence of $4,500 in unused PIP coverage directly related to Vasquez-Mejia's ability to afford the prescription medication. But this was the day after the accident. Vasquez-Mejia did not have this $4,500 in hand. He would have had to pay for the medication out of pocket (which he said he could not afford), submit the claim, and then hope for reimbursement, as the trial court explained. Again, there was great potential for prejudice. It is cannot be said that no reasonable person would have agreed with the trial court in excluding the evidence of the PIP benefits.

*Harmless error*

Vasquez-Mejia argues Garrison was not prejudiced by his inability to introduce evidence of PIP coverage for a single prescription. Vasquez-Mejia was cross-examined at length about his ability to afford the prescription medication. He also argues his case would have been strengthened if the trial court had let Garrison admit evidence of Vasquez-Mejia PIP coverage because the jury would have seen his attendance at physical therapy became more sporadic only after his PIP benefits were exhausted.

If it was error to exclude the PIP evidence for the specific purpose of impeaching Vasquez-Mejia's testimony, it was harmless error. Vasquez-Mejia was cross-examined on his ability to afford the prescription medication. Moreover, the defense was attempting to show that Vasquez-Mejia was not injured as badly as he said he was. However, there was ample medical testimony from experts concerning his injury. Vasquez-Mejia took over-the-counter pain medication, he continued to seek treatment after March 17, he went through two rounds of physical therapy, got x-rays, an MRI, and considered surgery. The benefit to the defense in further impeaching Vasquez-Mejia's testimony on his ability to pay for a single prescription medication was minimal. Any error in excluding evidence of his PIP coverage was harmless.

### DID THE TRIAL COURT ABUSE ITS DISCRETION BY ADMITTING TESTIMONY CONCERNING THE COST OF SURGERY OVER FOUNDATION AND HEARSAY OBJECTIONS?

*Vasquez-Mejia's Testimony*

Vasquez-Mejia's counsel asked him if he remembered "what they told you the cost of the surgery would be?" The "they" was presumably Mid-America Orthopedics, Dr. Nienke's office. Garrison objected on the basis of hearsay and introducing facts not in evidence. The trial court overruled the objection. Vasquez-Mejia testified it was $81,000 plus anesthesia and other costs.

An out-of-court statement offered to prove the truth of the matter asserted is hearsay and inadmissible unless an exception applies. K.S.A. 2018 Supp. 60-460. The purpose of the rule is to ensure the declarant is available for cross-examination to test the credibility of the declarant and, thus, the reliability of the statement. *State v. Seacat*, 303 Kan. 622, 635, 366 P.3d 208 (2016). The admissibility of evidence under an exception to the hearsay rule is reviewed for abuse of discretion. *Seacat*, 303 Kan. at 634-35.

11

Garrison is correct that no hearsay exception applied. The parties cite K.S.A. 2018 Supp. 60-460(a) and (c). However, Vasquez-Mejia argues the statement was not hearsay because it was not offered to prove the truth of the matter asserted. Rather it went to Vasquez-Mejia's state of mind regarding whether to undergo surgery.

This is the first time Vasquez-Mejia has asserted that the statement was not introduced for the truth of the price quote. It certainly seemed like the statement was offered for the cost of the surgery. Even assuming Vasquez-Mejia is correct that it was not asserted for its truth, this testimony falls short of establishing a reasonable basis on which to award future medical costs.

*Olivia Ozuna's Testimony*

At trial, Vasquez-Mejia's counsel asked Ozuna, "Did [Vasquez-Mejia] ever indicate to you how much the doctor had told him that surgery would cost?" Garrison objected on the basis of hearsay. The trial court asked if Vasquez-Mejia was going to testify and then overruled the objection. Ozuna answered that the surgery would cost from $80,000 to $110,000.

On appeal, Garrison contends this was hearsay within hearsay. The statement was offered for the cost of the surgery, not for Vasquez-Mejia's statement about his conversation with the doctor. Garrison's hearsay objection was sufficient to preserve this issue for appellate review. See *State v. Brown*, 285 Kan. 261, 281, 173 P.3d 612 (2007), *abrogated on other grounds by State v. Williams*, 306 Kan. 175, 392 P.3d 1267 (2017).

A hearsay statement that includes a hearsay statement made by another declarant is hearsay within hearsay. When hearsay within hearsay is offered, an exception must apply to each level of hearsay. K.S.A. 60-463; *State v. Humphrey*, 267 Kan. 45, 52, 978 P.2d 264 (1999).

Here, the problematic hearsay statement was Dr. Nienke's statement to Vasquez-Mejia. There is no apparent hearsay exception and Dr. Nienke was not present at the time of trial.

Vasquez-Mejia contends, for the first time, the statement was not hearsay because it was not offered to prove the truth of the matter asserted, i.e., the cost of surgery. Rather, the testimony was a response to attacks on Vasquez-Mejia's credibility.

However, in closing, Vasquez-Mejia's counsel used Ozuna's testimony to establish what the future medical expenses should be. "You heard the doctors tell you Mr. Vasquez[-Mejia] had to call when he was trying to see, can I get this surgery? And they told him 81 to $110,000.00." Thus, the doctor's statement was used to prove the truth of the matter asserted—the cost of surgery. The statements related directly to the amount of future medical expense damages and was impermissible hearsay.

*Dr. Nienke's Testimony*

During Dr. Nienke's deposition, Vasquez-Mejia's counsel asked Dr. Nienke:

"[L]et me ask you, Doctor, if you can give us an opinion on this.
"We got a price quote from a surgery center in Wichita for an anterior lumbar interbody fusion surgery at L4/5, and the cost we were given was $81,352 not including anesthesia or the hardware cost.
"Does that sound like a reasonable charge to you base on your experience in this field?"

Garrison objected on the basis of "lack of foundation, lack of knowledge." Dr. Nienke responded, "As far as I know, that seems about right." On cross-examination, Garrison asked if Dr. Nienke handles billing for his surgeries. He said, "No." Garrison asked if Dr. Nienke had a real grip on how much surgery costs. Dr. Nienke answered that

13

he had "heard figures. And the figures that I was given today are not atypical of what I heard." He said he had heard between $60 to 80,000 in the past.

The trial court later issued an order overruling the objection to Dr. Nienke's testimony. The court found that Garrison's objection "goes to its weight."

On appeal, Garrison contends: "Dr. Nienke did not testify to a reasonable cost of the spinal fusion surgery he recommended. Rather Vasquez-Mejia's attorney introduced a price quote from an unknown surgery center in Wichita in his question and Dr. Nienke essentially stipulated to the foundation of that quote." Garrison argues that if this question withstands the evidentiary objections, then it flies in the face of the rules of evidence. "A plaintiff introducing a quote from an unnamed source to his own expert without ever disclosing the information should not have been allowed." Garrison points out that in a report produced prior to trial, Dr. Nienke instructed counsel to contact his office's billing department for information on the cost of surgery.

Garrison is correct that Vasquez-Mejia's counsel asked an improper question that introduced to the jury a price quote from an unknown surgery center that was never admitted into evidence. Garrison was unable to cross-examine anyone from this unknown surgery center to verify the quote. But the objection was to foundation, specifically Dr. Nienke's knowledge about the costs of surgery.

Foundation refers to "'preliminary questions designed to establish that evidence is admissible.'" *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). Providing an adequate foundation prevents the finder of fact from being exposed to inadmissible evidence by any means. 302 Kan. at 74.

"As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience,

14

training or education if such be required." K.S.A. 60-419. Under K.S.A. 2018 Supp. 60-456(b), the court must decide whether an expert is qualified "by knowledge, skill, experience, training or education" to render an opinion. *Smart v. BNSF Railway. Co.*, 52 Kan. App. 2d 486, 494, 369 P.3d 966 (2016). Here Dr. Nienke was testifying as an expert, though an expert's testimony is not necessary to prove damages. *Hare v. Wendler*, 263 Kan. 434, Syl. ¶ 2, 949 P.2d 1141 (1997).

Whether evidentiary foundation requirements have been met is reviewed for abuse of discretion. *State v. Ernesti*, 291 Kan. 54, Syl. ¶ 10, 239 P.3d 40 (2010).

Damages need not be proven with absolute certainty. The fact-finder can estimate damages using a reasonable basis for computation and the best evidence available under the circumstances. However, claims for damages that are conjectural and speculative cannot form a sound basis for an award. *Miller v. Johnson*, 295 Kan. 636, 677, 289 P.3d 1098 (2012); *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1021, 360 P.3d 447 (2015). In *McKissick v. Frye*, 255 Kan. 566, 591-92, 876 P.2d 1371 (1994), our Supreme Court upheld an award of $30,000 for future medical costs based solely on a chiropractor's testimony that the plaintiff would require weekly treatment at a cost of $34 per visit.

Vasquez-Mejia contends that "Dr. Nienke is a skilled orthopedic surgeon practicing in the field for over twenty years. Performing orthopedic surgeries including single level back fusions are essentially how Dr. Nienke makes his living." He points out that Dr. Nienke gave his own estimate of $60,000 to $80,000 on cross-examination.

Dr. Nienke testified in his deposition that he was an orthopedic surgeon. He did his residency in orthopedic surgery and a fellowship in spine surgery. In his Wichita practice, he treated spine conditions only. He does not handle the billing for the surgery, but he had heard between $60,000 and $80,000 for a single level spinal fusion surgery. Dr. Nienke gave an opinion on the cost of the surgery he performs based on quotes he

15

had heard in his experience working as an orthopedic surgeon. It is difficult to say that no reasonable person would have found sufficient knowledge to admit Dr. Nienke's testimony concerning the cost of surgery.

The evidence in the record regarding damages is certainly not what one would expect to see in personal injury cases. However, there is no definitive method of proving damages that must be followed. The evidence supported $80,000 for the cost of surgery. Dr. Nienke's report, admitted into evidence, also listed the need for an LSO brace, post-operative pain medication, and physical therapy. The jury awarded $85,000. There was sufficient evidence for the jury to make a determination of damages.

"Insofar as jury awards for future medical expenses are concerned, a reviewing court will not reverse or direct a remittitur unless the amount awarded shocks the court's conscience." *Rodreick v. Estate of Wikoff*, 29 Kan. App. 2d 726, Syl. ¶ 4, 31 P.3d 307 (2001) (jury award of $21,000 when evidence of future medical expenses was $13,500 did not shock the conscience). The award of damages in this case does not shock the conscience of the court.

Affirmed.