No. 23,688.

THE STATE OF KANSAS, *Appellee,* v. GEORGE W. CRUSE, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*Uxoricide—Sufficient Information.* An information for murder which with other appropriate recitals charged that the defendant—

"With his hands, seized, grasped and pressed the neck and throat of her the said Ella Cruse and did use other means and instruments a more definite and certain description of which affiant is unable to give for the reason that he does not know the same," etc.

was not subject to the objection that it was too indefinite and uncertain and that it charged more than one offense; and the motion to quash was properly overruled.

2. SAME—*Written Objection to Introduction of Evidence.* A lengthy written objection to the introduction of evidence examined, and held that it did not apprise the court that its purpose was to raise the point that the defendant had not been arraigned nor asked to plead.

3. SAME—*Waiver of Arraignment.* When counsel for defendant were asked if they were ready for trial, and one of them nudged his associate and both "said nothing," their silence was equivalent to an affirmative response.

4. SAME—*Motion to Direct Verdict Properly Overruled.* The state's evidence summarized, and held to show that the motion to discharge the defendant and the motion directing a verdict of acquittal were properly overruled.

5. SAME—*Evidence—Cross-examination.* Various matters developed on cross-examination and in rebuttal examined and no prejudicial error discerned therein.

6. SAME—*Evidence—Statements of Third Party.* Statements of a third party to the prejudice of one accused of crime, made in his presence and which he tolerates without resentment, explanation or denial, are ordinarily admissible as some evidence of his consciousness of guilt.

7. SAME—*Evidence—Discordant Marital Relationship.* Evidence of a discordant marital relationship and of a husband's previous ill treatment of his wife are admissible to prove motive in a case of uxoricide.

8. SAME—*Evidence—Rebuttal Evidence.* When upon cross-examination the fact is elicited that a witness is prejudiced against a defendant accused of crime, it is competent on rebuttal to show that a righteous and not a reprehensible motive has given rise to his prejudice, so as to lessen any discrediting effect of his admission of hostility.

9. SAME—*Evidence—Appearance of Body After Being Embalmed.* The fact that the body of a victim of murder had been embalmed before nonexpert witnesses had an opportunity to examine it for marks of violence did not render the testimony of such witnesses inadmissible.

10. SAME—*Instructions.* The instructions examined and no error to the prejudice of defendant discerned therein.

The State v. Cruse.

Appeal from Sedgwick district court, division No. 3; Jesse D. Wall, judge. Opinion filed January 6, 1923. Affirmed.

*S. B. Amidon, S. A. Buckland, Harry W. Hart,* and *Glenn Porter,* all of Wichita, for the appellant.

*Richard J. Hopkins,* attorney-general, *James A. Conly,* county attorney, *I. N. Williams,* and *Sidney L. Foulston,* deputy county attorneys, for the appellee.

The opinion of the court was delivered by

Dawson, J.: The defendant, George W. Cruse, was convicted of uxoricide.

The evidence for the state tended to show that George W. Cruse and Ella Cruse, his wife, resided in a duplex house in Wichita, and that their married life was stormy, and that the defendant became enamored with a young woman in Topeka, Kathleen Foley. He told her and her parents that his wife was a bad woman who kept a rooming and gambling house in Denver, and that he had not lived with her for four years and that he was going to get a divorce from her. He became engaged to Miss Foley and told her sister he was going to obtain a divorce and would marry Miss Foley in June, 1921. Defendant's wife was a woman in apparently good health. On the night of February 5, 1921, she retired with her husband. An occupant of the same house heard them talking in rather loud, harsh tones. About three o'clock on the following morning, the defendant aroused other residents of the house, saying that his wife was sick and to come quick. The first of these to reach her found her lying on the bed. He testified that her face was ashy, like one in a faint or dead; there seemed to be black splotches on her face—"looked like one when they were choking." Some eight witnesses who saw the body either that morning, or later after it was embalmed, testified that there were marks the size of finger prints on the neck from the jawbone down, marks on back of neck, bruises on throat and side of neck of the size of thumb and finger, bruises on neck which looked like finger prints, marks on arm and cheek, bruise on hand and elbow, two cuts on right hand, bruise on right cheek, cut on shoulder by the neck. A doctor who performed an autopsy testified that the body of the victim was in a healthy condition and gave his opinion that death had been caused by strangulation or suffocation. Several of the witnesses testified that the body bore black-and-blue marks on the legs from the knees down; there were bruises, some dark spots above the knee. To the

first witness, who appeared in the early hours of February 6, and who with defendant had attempted to revive the woman and on whose suggestion the defendant called a physician, the defendant several times addressed the question: "We did all we could, didn't we?" And an hour later defendant came to the apartment of the witness and repeated: "We did all we could, didn't we?" After a coroner's inquest, the defendant was arrested and released on bond. Shortly thereafter he went to the house of the Foley family in Topeka, and endeavored to persuade Miss Foley and her mother to leave the state until after his trial, saying that if they came to Wichita as witnesses "it meant ninety-nine years in the pen for him." He left three checks with the Foley family to defray the expenses of mother and daughter in leaving the state. He also requested Mrs. Foley to say to any telephone inquiries that she did not know him; and on her refusal to agree to this, he requested her to write a friendly letter to his mother as if the two families had been friends for years.

Such were the most significant incidents testified to against defendant. The testimony touching the marks on the woman's throat, neck, body and limbs, came mostly from nonexpert witnesses—neighbors, relatives, and the undertaker. The doctor called by the defendant on the night of the woman's death testified for defendant that he saw nothing out of the ordinary and that he saw no marks to indicate that she had been choked, that he thought she had not died of strangulation or suffocation and that "the cause of death was natural." On cross-examination by the state, this doctor testified that he thought he would have seen marks upon the body if any were there; that he only examined the upper portion, but did not examine the head nor the arms, that he was in the room ten or fifteen minutes but did not use all that time examining the body, "did not consider it necessary," and that he did not examine the rest of the body because his suspicions were not aroused. The other evidence in the case, which has been carefully perused, had little bearing upon the guilt or innocence of the accused.

The defendant was found guilty of murder in the second degree and appeals, assigning many errors, which will be noted in detail.

The first error assigned relates to the overruling of defendant's motion to quash. The information, with other appropriate recitals, alleged that the defendant—

"With his hands, seized, grasped and pressed the neck and throat of her

The State v. Cruse.

the said Ella Cruse and did use other means and instruments a more definite and certain description of which, affiant is unable to give for the reason that he does not know the same, etc."

Defendant contends that this charge was too indefinite and uncertain and that it charged more than one offense, and that it did not apprise him of the manner, means, or method which it was claimed he used in committing the crime. This contention cannot be sustained. But one offense was charged—the murderous killing of his wife—and the court would have no difficulty in pronouncing sentence on such a charge if a conviction were had. (*The State v. Hutzel,* 108 Kan. 456, 195 Pac. 887.) The manner, means and method were as definitely alleged as the nature of the case, the circumstances, and the absence of eyewitnesses, would permit. The additional language included in the charge, that the defendant "did use other means and instruments a more definite and certain description of which affiant is unable to give for the reason that he does not know," is not objectionable. It has the approval of good authority. In *R. & E. Conde v. The State,* 33 Tex. Crim. App. 10, a murder case, where a reversal was required for various errors, the appellate court said:

"In view of another trial, we would call attention to the fact that the evidence fails to show the deceased came to his death either by a gun-shot or knife wound, as alleged in the indictment. . . . We would further suggest that another indictment be found, in which the further allegation be inserted that the deceased came to his death by some means, and by use of some weapon, to the grand jurors unknown, in order to meet all phases of the testimony adduced on the trial." (p. 13.)

In *Hicks v. The State,* 105 Ga. 627, the presentment charged that the defendant "did then and there . . . by choking and by other means to the jurors unknown, . . . kill and murder one Miley Hicks," etc. The court said:

"The presentment alleges that the killing was done 'by choking,' and also 'by other means to the jurors unknown.' It appeared from the evidence introduced in the trial of the case, after the demurrer had been overruled, that the circumstances of the killing would not admit of greater certainty in stating the means employed in committing the offense. It was held in the case of *Commonwealth v. Webster,* 5 Cush. 295, that 'An averment in an indictment for murder that the defendant committed the crime at a place specified, "in some way and manner, and by some means, instruments, and weapons to the jurors unknown," is sufficient, when the circumstances of the case will not admit of greater certainty in stating the means of death.' We think, therefore, that the court did not err in overruling the demurrer to the presentment." (629.)

See, also, Kelley's Criminal Law and Practice, (3d ed.) 429, 430; 21 Cyc. 843.

The second error assigned relates to the overruling of defendant's written objection to the introduction of evidence. The brief suggests that the purpose of the objection was to raise the point that defendant had not been arraigned nor asked to plead. But the written objection interposed gave no hint of this point. It contained a cloud of words covering a printed page of the brief, repeating the objections raised in the motion to quash, and reciting that—

"This defendant is not apprised of the charge against him or of what means and instruments said defendant is charged with using to commit the crime charged in said amended information, and for the further reason the said defendant does not know what is attempted to be charged against him and what he is charged with having done, and said information raises no issue which this defendant can meet; and that there are no issues raised in this case, and for the further reason that it is not fair to the defendant to be forced to trial in this condition or under this amended information, because of the fact as hereinbefore set forth, and because of vagueness, uncertainty and indefiniteness of said amended information."

After the motion to quash was overruled the transcript recites:

"Thereupon, the parties announce themselves ready for trial. (Recess until 2:15 o'clock, p. m. same day.)"

The want of arraignment and plea was raised in the motion for a new trial and in the motion in arrest of judgment. In these latter proceedings the accuracy of the recital in the transcript quoted above was questioned, but the objection to it was not sustained. A photographic copy of the reporter's notes is produced, which might tend to show that the quoted recital was an' interpolation, and we are asked to rule on our own judgment that the recital in the transcript must be incorrect. Even if it were an interpolation, it would not necessarily follow that it was not true. The reporter might have merely corrected a fault of his own, by inserting what he should have set down as it transpired. Moreover, it was shown by affidavits that when the case was set for trial, counsel for defendant announced "that they waived arraignment, reserving the right to file a motion to quash." After the motion to quash was overruled, according to some of the affidavits, the court inquired if the parties were ready, and counsel for the state answered in the affirmative, and the affiants' recollections were "that the attorneys for the defense said they were ready for trial." The showing made

The State v. Cruse.

by defendant is not altogether at variance with this. One of defendant's counsel deposed:

"Q. Just state what occurred. A. When the announcement was made by Mr. Williams, the court, I think, *asked if we were ready for trial.* Mr. Porter nudged me and we said nothing.

"Q. You remember that distinctly? A. Yes, sir; I remember that very distinctly."

On this seeming but not serious conflict of testimony the finding of the trial court must be regarded as conclusive. In *The State, ex rel., v. Lyons,* 106 Kan. 860, 189 Pac. 976, there was a dispute between counsel as to whether a request for the appointment of a guardian *ad litem* had been made. It was said:

"In the rivalry and bustle which often attend the conduct of a stoutly contested lawsuit, it is not very unusual for opposing counsel to disagree as to some of the incidents which transpire in the course of a trial. . . .

"Here, then, is a triangular dispute as to a question of fact—that it did happen, that it did not happen, and that something pertinent though different did informally happen. This court cannot resolve such a dispute. That is the function of the trial court. (*Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.) Moreover, if the trial judge had been positive as to the accuracy of his own recollection of the incident, his personal knowledge would have been equivalent to evidence. (*Christisen v. Bartlett,* 73 Kan. 401, 403, 84 Pac. 530, 85 Pac. 594.)" (pp. 862, 863.)

Furthermore, if the facts narrated in the deposition of counsel for defendant, quoted above, be adopted as the most accurate statement of what transpired, the silence of counsel when the court "asked if we were ready for trial," was equivalent to an affirmative response. *Qui tacet consentire videtur.* It is settled law that arraignment and plea may be waived (*The State v. Glave,* 51 Kan. 330, 33 Pac. 8; *The State v. Baker,* 57 Kan. 541, 544, 545, 46 Pac. 947) ; and it is waived in effect by an announcement that defendant is ready for trial. (*The State v. Cassady,* 12 Kan. 550, syl. § 7; 16 C. J. 391, 392.) In *The State v. Moore,* 61 Kan. 732, 60 Pac. 748, the judgment was not reversed for the want of an arraignment, but because defendant was arraigned and required to plead in the absence of his counsel.

The next error relates to the overruling of defendant's motion to discharge the defendant at the close of the state's evidence and the overruling of his motion directing a verdict of acquittal. These motions were based upon the assumption that the *corpus delicti* and defendant's guilt were not proved. How very far from correct

was such assumption is apparent from the summary of the state's evidence which we have given above. The evidence to prove the *corpus delicti* and the evidence to establish the guilt of a defendant are not necessarily matters which have to be separately developed and kept apart like files of unrelated matters in the pigeonholes of a lawyer's desk. Frequently, as in this case, neither is completely established until all the evidence on both points, the fact of the crime and defendant's guilt, is presented to the trial court and jury. From the state's evidence and the evidential circumstances, and notwithstanding the negative testimony of the doctor who was called on the night of the woman's death—founded upon his careless, partial and inconclusive examination of her body—the violent death of Ella Cruse at the hands of defendant and his motive therefor were far too persuasively established to make the issue one where the trial court could dispense with the functions and service of the jury, and so the motions to discharge and to direct a verdict were properly overruled.

The next error assigned relates to the admission of certain testimony.

The defendant sought to show by cross-examination of the state's witness, Mrs. McGaha, sister of the deceased, that the witness had said to Mrs. Dillard, aunt of the defendant, that she didn't think defendant was guilty but that she was going to make defendant's mother spend some of her money. The witness denied having said anything of the sort. Mrs. Dillard was later called as a witness for defendant and she testified:

"Q. Do you know Mrs. McGaha? A. I do. . . .

"Q. Mrs. Dillard, if after the death of Mrs. Ella Cruse, you and her came down to see about buying some clothes to bury her in? A. We did.

"Q. Mrs. McGaha? If going across the street to Inness' Store she said this to you or this in substance here in the city of Wichita a day or two after the death of Ella Cruse, 'We have no evidence against George' referring to George Cruse, 'We don't think he killed her but we are going to make the old woman or the old lady spend a little of her money' or words to that effect? A. She said exactly those words or very nearly.

"Cross-examination . . .

"Q. Did you say anything? A. I did not. . . .

"Q. She stated that and you did not say anything at all? A. I did not, I had nothing to say."

The state called Mrs. McGaha in rebuttal to give her version of the conversation:

The State v. Cruse.

"Q. Did you have a conversation with Mrs. Dillard? A. Yes, sir. . . .

"Q. Will you state when that conversation was in—about when it was? A. Well, on Monday after my sister's death. . . .

[Objection—Overruled.]

"Q. What, if anything, did Mrs. Dillard say to you? [Objection.—Overruled.] When I spoke about this she said that she would not be at all surprised if he done it because he abused his own father and mother and said—well if you want me to say more—(interrupted) . . .

"Q. Had you finished your answer? A. No, sir, she said more than that. . . .

"A. She asked me—I told her I would hate to think that of anyone but I said that she had marks on her neck and it looked like she did not die a natural death and she said, well,—'Well, don't you think if she did it that it could be settled out of court?' and I said do you think—(interrupted).

"Defendant's counsel: To which we object as incompetent, irrelevant and immaterial.

"By the Court: The latter part will be sustained.

"Cross Examination. . . .

"Q. Is that all? A. No.

"Q. What else? A. I asked her if she was willing, if her sister would die under the same circumstances, if she would let it go at that and she said no but she said they had money and would fight it.

"Defendant's Counsel: To which we object as hearsay and incompetent, irrelevant and immaterial and not rebuttal. . . .

"By the Court: The question that occurs to me whether or not on cross-examination when the witness was asked these impeaching questions, or a question which counsel says was an impeaching question, then the defense introduces a witness who testifies as to the conversation—whether or not then the state has a right to introduce a witness to give her version as to the conversation which is not covered entirely by that witnesses—by the cross-examination of this witness." [Overruled.]

The defendant's contention was that when upon cross-examination of Mrs. McGaha she denied making the statement insinuated by question of counsel, and when defendant had shown by Mrs. Dillard that Mrs. McGaha had made that statement, that this closed the incident, and that the state was precluded from showing what the conversation actually was, and that the state was precluded from showing that Mrs. Dillard's testimony that she had not said anything was untrue. We do not so understand the rules of evidence. The state introduced no evidence of any conversation between these two women on this relatively inconsequential matter up to the time counsel for the defendant sought to develop it by Mrs. McGaha, the state's witness. Then Mrs. Dillard, witness for defendant, in response to a leading question, testified that such con-

versation was had. She further testified that she herself had said nothing. Surely the state then had the right in rebuttal to show what the conversation was, and to show that Mrs. Dillard's testimony that she herself had said nothing was not true. The trial court's reasoning (abridged above) and its ruling were not erroneous.

Another witness testified that he and the defendant took defendant's mother home in a car the morning after the tragedy and that the following conversation was had in defendant's presence:

"Q. Did you say you took Mrs. Cruse, the mother of Mr. Cruse, home that morning, did you? A. Yes, sir. . . .

"Q. Now, was Mr. Cruse with you at that time? A. Yes, sir.

"Q. Mr. Cruse went home with his mother? A. Yes, sir.

"Q. Was there any conversation took place between any of you when you were taking them home that morning? A. Yes, sir.

"Q. What was that conversation? . . . A. Mrs. Cruse says, 'It scared me when George called me; I could not imagine what had happened, because you know they led such a stormy life.' . . .

"Q. Was Mr. Cruse present? A. Mr. Cruse was in the car."

[Objection—Overruled.]

This evidence falls within the rule that statements to the prejudice of an accused, made in his presence and which he tolerates without resentment, explanation or denial, are ordinarily admissible as some evidence of his consciousness of guilt. The leading authorities on this subject are elaborately discussed in *State v. Mortensen*, 26 Utah, 312, 73 Pac. 562, and section 4 of the syllabus therein reads:

"Defendant was suspected of having killed deceased, and after deceased's body had been dug up, and while it was lying in a patrol wagon, deceased's father said, while defendant was within six or eight feet from him and near the vehicle, as though talking to the body, 'He murdered you for a receipt that was on your body representing $3,800, and you never ran away, nor he never gave you a dollar.' *Held,* in a prosecution of defendant for the homicide, that such statement by the father and the fact that defendant said nothing in reply, but hung his head and looked on the ground, was admissible as an admission indicative of guilt."

See, also, 16 C. J. 631-633; 2 Wigmore on Evidence, pp. 1253-1261.

This evidence as well as the testimony that defendant had remained silent when reproached and chided by his wife's relatives for mistreatment of his wife, for beating her and kicking her out of bed, was admissible under the rule announced in *The State v. O'Neil*, 51 Kan. 651, 33 Pac. 287:

"Ill treatment and previous assaults by husband on wife are admissible to prove motive, in cases of marital homicide."

Another error assigned in the admission of evidence pertains to certain testimony of a brother-in-law of the dead woman. On cross-examination this witness testified that he was unfriendly to the defendant. The re-direct examination reads:

"Q. You say you are not friendly with him? What is the reason you are not friendly with him? . . . A. Well, I am not friendly with him because of his treatment of his wife that I know of.

"Q. What was that treatment?"

[Objection.]

"By the Court: The objection will be overruled in so far as he has personal knowledge. A. Beg pardon, what was the question?

"Q. You say that treatment, you say because of the treatment of his wife that you are not friendly? A. Because I knew that he abused her and beat her and kicked her.

"Defendant's Counsel: We move to strike out the answer of this witness as false, maliciously false, and made with the purpose and intent to harm and injure this defendant, and for the further reason that the witness testified on the coroner's inquest and preliminary examination that he had no personal knowledge concerning the same and that it is hearsay testimony. Because he has a hatred does not allow him to go ahead and tell a lot of trash.

"By the Court: Interrogate him as to how he knows these things and if it is hearsay it will be stricken out. Interrogate him as to how he knows these matters."

Touching this evidence it will be noted that the defendant's counsel, properly enough (40 Cyc. 2481), had elicited from the witness the fact that he was hostile to defendant, from which it might be deduced that he was not worthy of credence. It was therefore proper on rebuttal to show that a righteous and not a reprehensible motive had given rise to the attitude of the witness toward defendant, so as to lessen any discrediting effect of his admission of hostility. (40 Cyc. 2571.) It should also be noted that the objection that the answer was "false, maliciously false," etc., was not good. The truth or falsity of the testimony was for the jury and could not be ruled out on such an unusual objection. Moreover, the trial court told counsel how it could be gotten rid of if it was hearsay.

Yet another complaint on the admission of evidence relates to the rebuttal testimony of J. M. Benham, who testified to matters pertaining to the coroner's inquest. An undertaker, Chas. E. Lahey, a witness for defendant, had testified that he saw no marks of any consequence on the body. The chief objection to Benham's testimony was that it was not rebuttal. But the court restricted Ben-

ham's examination to a narrative of marks upon the body which were pointed out at the inquest and which Lahey, who attended the inquest, must have seen, and Benham's testimony was admissible as tending to show that Lahey had not told the truth.

A general objection and argument is made against the state's evidence because most of the state's witnesses who testified concerning the marks on the body did not view it until after it was embalmed, when of course its condition was different from what it was when the woman died. That fact could only lessen the weight to the state's evidence; it did not destroy its admissibility. Not infrequently bodies are exhumed after embalming and burial for such fragmentary evidence as they may supply to solve the cause of death. (13 C. J. 1249, 1250; 17 C. J. 1144.)

Out of caution the defendant took exception to the thirty-three instructions given by the trial court, but his counsel frankly say that "there is not a great deal to complain of instructions given by the court in this case." They do urge that the significance to be attached to the evidence of defendant's prior ill treatment of his wife was not properly restricted to proof of motive. The instruction is subject to this criticism, but if it had accurately stated the law it would or should have had some potency against defendant; while as given it was somewhat too favorable to defendant and partly meaningless.

The court has patiently studied the abstracts and briefs of counsel, and has freely resorted to the transcript to inform itself fully touching the matters which transpired at the trial; but we find nothing in the record to justify a disturbance of the judgment.

Affirmed.