IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,430

STATE OF KANSAS,
*Appellee*,

v.

DEREK CAMPBELL,
*Appellant.*

SYLLABUS BY THE COURT

1.

A party may not object to evidence on one ground at trial and assert a different ground on appeal.

2.

Evidence of discord in a marital relationship that does not amount to a crime or civil wrong is not subject to the limitations of K.S.A. 2017 Supp. 60-455.

3.

Heat of passion voluntary manslaughter requires legally sufficient provocation that would cause a reasonable person to lose control of his or her actions and reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation.

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed August 17, 2018. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: A jury convicted Derek Campbell of first-degree premeditated murder of his wife, Rebecca Campbell. The district court sentenced him to life in prison without the possibility of parole for 50 years. Campbell now makes four arguments for reversal of his conviction: (1) the State improperly rehabilitated a jailhouse informant by introducing testimony of past instances when the informant was credible; (2) the district court erred by admitting testimony from another witness who described Campbell as controlling of Rebecca; (3) the district court erred in failing to instruct the jury on voluntary manslaughter; and (4) cumulative error. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on April 8, 2015, Campbell called 911 from his home to report that he had shot his wife. Campbell told the dispatcher that his handgun inadvertently discharged when he removed it from its holster. Rebecca was sitting in a recliner when the bullet struck her. Campbell stated she was bleeding from the head but still breathing. He also said he was a "concealed carry holder" and did not know why the gun discharged.

An officer arrived while Campbell was speaking with the dispatcher. When asked what happened, Campbell told the officer that the gun "just went off" when he removed it from its holster. Campbell repeated that he was a concealed carry holder and "very careful with firearms." He also told the officer he had just returned from being out on a drive. At some point, Campbell claimed to have vertigo and asked to sit.

2

By this time, Rebecca was dead. At trial, a forensic pathologist testified she died as a result of a gunshot wound to her head. In the living room, officers found a .38 caliber revolver on a coffee table. And next to it were four cartridges and one spent cartridge.

A few hours later, two different officers interrogated Campbell. After waiving his *Miranda* rights, Campbell gave them his version of the events. Earlier that evening, Campbell drove around and visited with Tiffany Libel, who he said was an old friend he had not seen in several years. He arrived home around midnight and went inside to his daughter's bedroom. He kissed his daughter and told her he loved her. Campbell then went to the living room where Rebecca was sitting in a recliner. He handed Rebecca his cell phone and told her the battery was low. According to Campbell, he removed the holster from his waistband while Rebecca was plugging in the phone. And when he removed the revolver from the holster, it inadvertently discharged. Shocked, he immediately opened the cylinder and saw Rebecca "slump" in her chair. Campbell tossed the revolver on a table and looked for a phone to call 911.

As the interview progressed, the officers pressed Campbell to explain how the revolver could have accidentally discharged. Campbell posited that because he suffered from vertigo, he may have lost his balance while setting down the gun, causing it to discharge. Later he hypothesized the revolver could have been inadvertently cocked before he went inside the house—though Campbell admitted the revolver had a "firm cocking mechanism."

The State charged Campbell with a single count of premeditated first-degree murder. The district court conducted an eight-day jury trial during which the State called 20 witnesses to testify. Both the video of the custodial interrogation and the recording of the 911 call were admitted into evidence and played for the jury.

3

Libel testified she knew Campbell and Rebecca from high school. After high school, Campbell and Libel dated for about one year. Even after they separated, Campbell and Libel maintained "off and on" contact. Three days before Rebecca's death, the two began speaking through Facebook Messenger. The next day, Campbell surprised Libel by showing up at her work while she was on her lunch break. Campbell said he was miserable in his marriage and wanted a divorce. He told Libel that he was frustrated because Rebecca "wouldn't give" him a divorce, so he planned to file a divorce form that did not require Rebecca's signature.

The following evening Campbell and Libel drove around and spoke. Campbell repeated that he was miserable in his marriage and wanted a divorce. He had presented Rebecca with divorce papers, but she refused to sign them. Campbell also complained that Rebecca was clingy, constantly wanting to be with him. That night while Libel and Campbell were together, Rebecca called Campbell a couple times. She wanted to know where he was and when he would be home. After the call ended, Campbell mocked Rebecca.

The State also introduced the Facebook messages sent between Campbell and Libel the days before the shooting. Several of them confirmed Campbell's displeasure with Rebecca. He told Libel that he had mentioned divorce to Rebecca "a lot recently." Campbell said he wanted to have another child but "not with Becky [because there was] too much drama and stress." Although Campbell at first enjoyed being married, over time Rebecca became "worse and worse" about always wanting to be around him.

Other messages were sexual in tone. Campbell told Libel he had found "some very interesting pics" of her. Libel testified these were photos of her "in a state of undress." He also asked Libel for recent photos of her and reminisced about "the stuff [they] used to do." When Libel mentioned that she had recently seen Campbell in Wal-Mart, Campbell replied: "[Y]ou could [have] made me follow you into the family restroom and had your

4

way with me." Had they not split up, Campbell thought they would be married with kids. He told Libel he missed the closeness and intimacy of their relationship. Campbell could not remember why they separated.

A search of Campbell's computer revealed that during the months before Rebecca's death, Campbell searched several times for divorce-related information. He also visited several dating websites.

While awaiting trial in the Sedgwick County Jail, Campbell talked to another inmate, Ronald Rudisill, about the shooting. Rudisill said he and Campbell were friendly with each other. Rudisill claimed Campbell at first told him that he lost his balance while unholstering his gun, which caused him to squeeze the trigger and inadvertently shoot Rebecca. When Rudisill learned the gun was a revolver, he told Campbell that he thought the story was "BS" because Rudisill knew a revolver had to be cocked with "so many pounds of pressure to pull the trigger."

Rudisill testified that Campbell eventually confessed that he intentionally shot Rebecca. Rudisill also claimed that Campbell told him how it happened. That evening, Campbell drove around with his ex-girlfriend, ignoring Rebecca's phone calls. When he arrived home, Rebecca started yelling at him. Campbell went outside, cocked the gun, went back inside, and shot Rebecca while she was sitting in a recliner. Campbell concocted the story about losing his balance as a cover. Rudisill said Campbell drew him a diagram of the house, which Rudisill later reproduced from memory.

On cross-examination, defense counsel asked Rudisill about his criminal history, including a forgery conviction that he did not mention on direct examination. The State later tried to rehabilitate Rudisill with testimony from an Assistant United States Attorney who had worked with Rudisill in prior criminal cases. The attorney told the jury she had

"found Ronnie Rudisill to be extremely credible on each occasion that [she] dealt with him."

Tonya Campbell—who was married to Campbell's brother—testified she had known Campbell since 1999. She thought Campbell and Rebecca seemed "relatively happy" early in their relationship, but their affections for each other changed over time. Later in their relationship, Tonya noticed Campbell and Rebecca were always together as if "one of them didn't trust the other one or it was kind of mutual distrust." She never saw any signs of physical violence, but Tonya observed that Campbell often belittled and criticized Rebecca.

When the State asked Tonya about her discussion with officers, defense counsel objected, claiming any testimony that Campbell was "controlling" of Rebecca was irrelevant. But the court overruled the objection. Tonya said Campbell and Rebecca's relationship could be described as "controlling" because "Derek always wanted to have things his way. . . . It was always what Derek wanted to do."

Campbell testified in his own defense. He claimed that when he returned from driving around with Libel, he removed the gun from the holster and unloaded the bullets into his hand. He put the bullets in his pocket and returned the gun to its holster. After checking on their daughter, he went to the living room where he spoke with Rebecca. At this point, he handed her his cell phone and asked her to charge it. While waiting for Rebecca to plug in the phone, he removed the gun from its holster and started "messing around with" it. Campbell "started dry firing it, and on the third dry fire it went off." He was shocked. And upon opening the chambers, he discovered a spent cartridge. He then noticed Rebecca slump in her chair and begin bleeding.

When asked why he had never provided this explanation before, Campbell said he "was in shock and scared and I didn't even understand what truly had happened until later

6

on." Campbell claimed that Rebecca knew he had been with Libel, and she did not complain about him spending time with her. Campbell also denied telling Rudisill that he intentionally shot Rebecca.

At the instructions conference, Campbell's counsel proposed a "heat of passion" voluntary manslaughter instruction, but the court found it was not factually appropriate. The court ultimately instructed the jury on first-degree premeditated murder, second-degree intentional murder, second-degree reckless murder, and involuntary manslaughter. The jury unanimously convicted Campbell of first-degree premeditated murder. The district court later sentenced him to a hard 50 life sentence, and Campbell timely appealed to this court.

Our jurisdiction is proper. See K.S.A. 2017 Supp. 22-3601(b)(3) (providing for direct appeal to the Supreme Court from a district court's final judgment when a maximum sentence of life imprisonment has been imposed).

ANALYSIS

*Campbell did not appropriately object to the State's attempt to rehabilitate Rudisill.*

The first issue we take up is Campbell's argument that the State improperly rehabilitated Rudisill's credibility. The State first responds that defense counsel did not preserve this argument with an appropriate objection. Second, the State contends it properly rehabilitated Rudisill. Since we agree with the State's preservation argument, we do not reach the merits.

During the State's case-in-chief, defense counsel attacked Rudisill's credibility. In doing so, defense counsel cross-examined Rudisill extensively about his criminal history, including a 2006 forgery conviction he failed to mention on direct examination. Defense

7

counsel also asked about other times in which Rudisill had provided prosecutors with information. In particular, defense counsel asked Rudisill if he remembered the name of a federal prosecutor to whom he provided information in 2006. He responded with the name, Terra Morehead.

Before trial resumed the next day, the prosecutor announced:

"Through the cross[-]examination of Mr. Rudisill, I believe the defense has now questioned the credibility of Mr. Rudisill as a snitch witness or turncoat witness or jailhouse informant. As such, the State now would like to call Miss Morehead to rehabilitate the credibility of Mr. Rudisill as to her opinion and experience with Mr. Rudisill in his providing information to the government."

The State asked to call Morehead the next day. Defense counsel responded: "I will think about it and I will make my objection at the time, if I have one." But the court asked defense counsel to give a response "by close of business today." Upon recessing for lunch, defense counsel entered a "multipart" objection to Morehead's testimony:

"One, I think she's being called to vouch for [Rudisill]. Two, I think she's being called to bolster the State's witness' credibility. Three, Mr. Rudisill has been excused from his subpoena. I understand that as far as the prosecution knows he is not here. We're going to be hearing hearsay statements from Mr. Rudisill. I don't know whether they will be hearsay statements . . . he has made before and I think under *Crawford* that's inadmissible. So I object to calling Miss Morehead."

The prosecution responded that it was not seeking to bolster or vouch for Rudisill. It claimed that Morehead would provide proper rebuttal of impeachment evidence through "opinion, reputation testimony as to character for honesty." The State also claimed that no hearsay statements were necessary. The court and the prosecutor then discussed what type of testimony is permissible under K.S.A. 60-422.

8

At some point in the discussions, defense counsel interjected that his suspicion was the State would call Morehead and ask, "[D]id [Rudisill] testify and did [Rudisill] tell the truth, . . . but my position would be they don't know because they don't know what the truth is." After taking the lunch recess to consider the matter, the court announced that because the defense had attacked Rudisill's credibility, it would allow Morehead to testify about Rudisill's reputation for truthfulness. Yet the court warned the State that it had to lay a sufficient foundation to admit Morehead's testimony. Defense counsel then lodged an objection "based on . . . our discussions with [the court], but I won't say the reason, and that will, I think, preserve it." The court granted defense counsel a standing objection.

The next day of trial, the State called Morehead to testify. Defense counsel promptly renewed "all the objections that I had to her testimony and which we discussed on the record yesterday." The court overruled the objection and granted a continuing objection.

Morehead generally testified that Rudisill had provided her information in three prior cases she had worked on, and he testified in two of them. She eventually testified that she had "found Ronnie Rudisill to be extremely credible on each occasion that I dealt with him."

On appeal, the State contends Campbell did not preserve his current challenge to Morehead's testimony. Preservation is question of law subject to plenary review. *State v. Jones*, 298 Kan. 324, 330, 311 P.3d 1125 (2013).

K.S.A. 60-404 provides:

9

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

This statute is a "legislative mandate" that "dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). In keeping with this mandate, appellate courts do not permit a party to object to evidence on one ground at trial and assert a different ground on appeal. *State v. Lloyd*, 299 Kan. 620, 637, 325 P.3d 1122 (2014).

Once a witness has been impeached, his or her "character traits for honesty and veracity can . . . be shown by opinion testimony or evidence of reputation, and not by specific instances of the witness's conduct." *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, Syl. ¶ 5, 715 P.2d 2 (1986). At trial, Campbell objected on the grounds of hearsay and of bolstering or vouching for Rudisill's credibility. Campbell's difficulty on appeal is that of course Morehead was going to bolster Rudisill's credibility—that is the point of such rehabilitation testimony. Campbell's trial counsel either missed or intentionally chose not to assert the more salient objection below, which is that Morehead's proposed testimony would impermissibly utilize specific prior instances to rehabilitate Rudisill's credibility as opposed to offering mere opinion testimony or evidence of reputation.

On appeal, Campbell now asserts this objection to Morehead's testimony—a violation of the specific instances rule—for the first time. But in doing so, Campbell is raising an issue that is distinct from the ones raised at trial. See *Scogin v. Nugen*, 204 Kan. 568, 577, 464 P.2d 166 (1970) (holding issue was not preserved where "[t]he specific ground of the objection in the present case is not clear on the record before us");

see also *State v. Moore*, 302 Kan. 685, Syl. ¶ 4, 357 P.3d 275 (2015) ("K.S.A. 60-404 provides that a verdict will not be set aside by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of the objection."). Thus we will not consider this newly asserted challenge on appeal.

*The district court properly admitted Tonya's testimony describing Campbell as controlling of Rebecca.*

Next we consider Campbell's challenge to Tonya's testimony of Campbell being "controlling" of Rebecca. This testimony, he argues, was irrelevant. We disagree.

Before trial, the State moved to admit K.S.A. 60-455 evidence, including Tonya's testimony that Campbell was "controlling" of Rebecca, and he dictated what she could watch on television. This testimony, Campbell argued, was inadmissible under K.S.A. 2017 Supp. 60-455 because it did not constitute evidence of a "crime or civil wrong." The State countered that the evidence showed marital discord, which must be admitted through K.S.A. 2017 Supp. 60-455.

At a pretrial hearing, the district court ruled:

> "Other witnesses' statements [including Tonya's] subject to foundation and relevancy and time frame will be admissible pursuant to the record and 60-455 in the *Gunby* case. The 455 factors will be motive, intent, lack of mistake or accident, and relationship of the parties. I find they are more probative than prejudicial. They are relevant and material."

When Tonya testified about her discussion with the police, the State asked, "Did you use words to describe Derek's behavior towards Becky?" Tonya replied, "Yes," and defense counsel promptly objected on K.S.A. 60-455 and hearsay grounds. Outside the

11

presence of the jury, defense counsel restated that he thought Tonya's testimony about Campbell being controlling was not "[K.S.A.] 60-455 evidence by a long shot." The court overruled the objection and renewed its prior ruling.

Tonya then testified Campbell and Rebecca's relationship could be described as "[c]ontrolling" because "Derek always wanted to have things his way. . . . It was always what Derek wanted to do." At the end of trial, the court instructed the jury that evidence "tending to prove that the defendant committed bad acts other than the present crime charged" could be considered "solely for the purpose of proving the defendant's motive, intent, lack of accident, and the relationship between the parties."

On appeal, Campbell argues this evidence should not have been admitted under K.S.A. 2017 Supp. 60-455 because it was irrelevant to any material issue. The State continues to contend the district court properly admitted the evidence under K.S.A. 2017 Supp. 60-455.

We understand why the court below treated this evidence as subject to the limitations of K.S.A. 2017 Supp. 60-455. Our prior caselaw can be read to suggest that *any* evidence of marital discord qualifies as evidence of other crimes or civil wrongs. K.S.A. 2017 Supp. 60-455. But a closer examination convinces us that such a bright-line rule concerning marital discord is too broad. Unless and until mere discord ripens into a concrete crime or civil wrong, evidence of such discord is not by itself evidence subject to the limitations of K.S.A. 2017 Supp. 60-455. As we will explain, the evidence of discord in this case was not subject to K.S.A. 2017 Supp. 60-455.

We have long permitted evidence of marital discord in homicide cases. See, e.g., *The State v. Cruse*, 112 Kan. 486, Syl. ¶ 7, 212 P. 81 (1923) ("Evidence of a discordant marital relationship and of a husband's previous ill treatment of his wife are admissible to prove motive in a case of uxoricide."). But since our decision in *State v. Gunby*, 282 Kan.

12

39, 57, 144 P.3d 647 (2006), courts have been admitting this evidence subject to the limitations of K.S.A. 60-455.

In *Gunby*, this court tried to rein in what we described as the "rapid and enthusiastic development of various [K.S.A. 60-455] avoidance techniques." 282 Kan. at 54. Our concern was that these techniques would allow the "State to admit evidence independent of K.S.A. 60-455 and thus skirt its attendant safeguards." 282 Kan. at 54. We identified the "marital discord exception" as a prime example. 282 Kan. at 55. After reviewing the ways prior courts had admitted all sorts of evidence of marital discord independent of K.S.A. 60-455—from the ubiquitous "problems between spouses" to the more specific "violence between separated spouses"—the *Gunby* court stated:

> "Our increasingly elastic approach to the admission of evidence of other crimes and civil wrongs is overdue for correction . . . .
>
> . . . .
>
> "Under this reinvigorated reading to K.S.A. 60-455, should a district judge neglect to apply the safeguards we have outlined to any other crimes or civil wrongs evidence, we will find error." 282 Kan. at 55-57.

We acknowledge this discussion in *Gunby* cast the strong impression that we had overruled the so-called "marital discord exception" and that henceforth, even evidence of "problems between spouses" would be subject to the limits of K.S.A. 2017 Supp. 60-455. Indeed, some courts have read *Gunby* as a blanket rule that requires all evidence of marital discord to be admitted through K.S.A. 2017 Supp. 60-455. See *State v. Monda*, No. 99,244, 2009 WL 112798, at *11 (Kan. App. 2009) (unpublished opinion) ("[O]ur Supreme Court held in *Gunby* that evidence of a discordant relationship could no longer be admitted independent of K.S.A. 60-455."); *State v. Thurman*, No. 97,450, 2008 WL 2891064, at *4 (Kan. App. 2008) (unpublished opinion) ("*Gunby* did not change the fact

that evidence of prior marital discord could be admitted in cases such as this. It only required that the trial court perform the analysis under K.S.A. 60-455[.]").

But our corrective work in *Gunby* is now itself due for a tune up. As anyone possessing even a passing familiarity with the ups-and-downs of the marital relationship can easily attest, there is a vast distance between mere "problems" in a marriage and domestic violence or other acts that would qualify as other crimes or civil wrongs. The category of "marital discord" is far too broad to admit to a single, uniform rule concerning K.S.A. 2017 Supp. 60-455. Sometimes discord will ripen into actual other crimes or civil wrongs. Often, it will not. Courts must analyze the specific and concrete evidence in each instance to determine whether the evidence truly qualifies as evidence of other crimes or civil wrongs. Here, evidence that one spouse is "controlling" of another spouse is evidence of discord, yes, but it is not evidence of a crime or civil wrong. As such, its admission was not properly governed by K.S.A. 2017 Supp. 60-455.

We affirm the district court's admission of this evidence. See *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016) (affirming judgment as right for the wrong reason).

*An instruction for heat of passion voluntary manslaughter was not factually appropriate.*

Campbell's final substantive argument is that the jury should have been instructed on voluntary manslaughter based on a sudden quarrel with Rebecca. The State first contends Campbell did not request a sudden quarrel voluntary manslaughter instruction below, so a clearly erroneous standard of review applies. Second, it argues there was no evidence of a sudden quarrel between Campbell and Rebecca to justify a voluntary manslaughter instruction.

When reviewing jury instructions:

14

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011).'" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

We first consider preservation. In defense counsel's proposed instructions, he requested a heat-of-passion voluntary manslaughter instruction. Defense counsel later argued at the instructions conference that such an instruction was appropriate and the jury should determine whether there was sufficient provocation.

On appeal, Campbell argues a voluntary manslaughter instruction based on "sudden quarrel" was appropriate. We have noted that "Kansas, along with most states, considers sudden quarrel to be one form of heat of passion." *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). Accordingly, Campbell preserved this issue for appellate review. See *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012) ("Wade proposed a lesser included offense instruction on voluntary manslaughter and unequivocally objected to its omission during the instructions conference, arguing to the court the grounds upon which he believed the instruction was proper. The issue is fully preserved for our review."); see also *State v. Brown*, 300 Kan. 565, 585, 331 P.3d 797 (2014) ("There is no dispute that [the defendant] properly preserved this issue for appellate review by requesting a voluntary manslaughter instruction as a lesser included offense of second-degree murder.").

15

Turning to the merits of Campbell's claim, the parties agree this instruction would have been legally appropriate because voluntary manslaughter is a lesser included offense of first-degree murder. See *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008). Instead, they disagree about whether a voluntary manslaughter instruction was factually appropriate.

Whether the voluntary manslaughter instruction was factually appropriate depends on whether "'there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" *Williams*, 303 Kan. at 598. Rudisill's testimony is the only evidence admitted at trial that would support a voluntary manslaughter instruction. Rudisill claimed Campbell told him that when he got home from driving around with Libel, Rebecca "started yelling at him," so he walked outside, cocked the gun, and came back inside, and she leaned forward on the recliner and he shot her.

Kansas law provides that voluntary manslaughter is "knowingly killing a human being committed: (1) Upon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force . . . ." K.S.A. 2017 Supp. 21-5404. The core elements are an intentional killing and legally sufficient provocation. *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014).

Yet the statute does not define "sudden quarrel" or "heat of passion." Courts have defined "heat of passion" "as 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" 299 Kan. at 864. The provocation must be "'sufficient to cause an ordinary man to lose control of his actions and his reason.'" 299 Kan. at 864.

16

"Sudden" means "'[h]appening without warning; unforeseen[;] [c]haracterized by hastiness; abrupt; rash[;] [c]haracterized by rapidity; quick; swift." And "quarrel" means "'[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.'" *State v. Bernhardt,* 304 Kan. 460, 476, 372 P.3d 1161 (2016). "Mere words or gestures, however offensive, do not constitute legally sufficient provocation." *Hayes*, 299 Kan. at 866.

Even when we view the evidence in a light most favorable to Campbell, the evidence reveals Campbell and Rebecca's interaction was neither abrupt nor unforeseen. Campbell's exiting of the home to give him time to cock the gun before returning inside reveals a level of calculation. See *Hayes*, 299 Kan. at 865 ("[T]he defendant's calculated conduct belied his claim of action taken 'upon impulse without reflection,' and therefore did not support a heat-of-passion instruction."). What is more, the only evidence of a confrontation arose from Rebecca simply "yelling" at Campbell. This is insufficient to cause ordinary people to lose control of their actions. See *State v. Woods*, 301 Kan. 852, 878, 348 P.3d 583 (2015) (holding that a verbal confrontation between husband and wife was not enough to cause an ordinary person to lose control of his or her actions). Instead, the evidence admitted at trial points to nothing more than Campbell's "slow burn" of anger that led him to shoot Rebecca. See *Wade*, 295 Kan. at 926. A voluntary manslaughter instruction was not factually appropriate.

Finally, Campbell cannot avail himself of the cumulative error doctrine because no error occurred. See *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017) ("[I]f there is no error or only a single error, cumulative error does not supply a basis for reversal.").

Affirmed.

* * *

JOHNSON, J., dissenting:  I disagree with the majority's determination that the defense objection to the testimony of Terra Morehead was not preserved for appeal.

Defense counsel specifically advised the court of its concern that the State was calling Morehead to answer the question, "[D]id [Rudisill] testify and did [Rudisill] tell the truth," after which the district court granted the defense a standing objection. Slip op. at 9. The district court allowed Morehead's testimony as to the jailhouse informant's "reputation for truthfulness," slip op. at 9, and should have known that testimony that the jailhouse informant told the truth at an earlier trial was a specific instance that could not be used to establish that reputation. Later, the district court granted the defense a continuing objection to Morehead testifying, based on the defense counsel's statement that he was relying on "all the objections that [defense counsel] had to [Morehead's] testimony and which we discussed on the record yesterday." Slip op. at 9. In short, the district court's error in allowing Morehead's testimony was not the result of a misunderstanding as to the reasons that the defense objected to the testimony.

I would address the issue, find in favor of the defendant, reverse the conviction, and remand for a new trial.